# United States Court of Appeals
# for the Federal Circuit

PARKERVISION, INC.,

*Plaintiff-Appellant,*

v.

QUALCOMM INCORPORATED, QUALCOMM ATHEROS, INC.,

*Defendants-Appellees.*

*Appeals from the United States District Court for the Middle District of Florida Case No. 6:14-CV-00687-PGB-LHP, Hon. Paul G. Byron*

## CORRECTED RESPONSIVE BRIEF OF DEFENDANTS-APPELLEES QUALCOMM INCORPORATED AND QUALCOMM ATHEROS, INC.

KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST
MATTHEW M. WERDEGAR
SOPHIE HOOD
ANJALI SRINIVASAN
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
Rvannest@keker.com
Mwerdegar@keker.com
Shood@keker.com
Asrinivasan@keker.com

COOLEY LLP
MATTHEW BRIGHAM
DENA CHEN
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile:  (650) 843-7400
Dchen@cooley.com
Mbrigham@cooley.com

COOLEY LLP
EAMONN GARDNER
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Telephone: (720) 566-4000
Facsimile:  (720) 566-4099
Egardner@cooley.com

*Attorneys for Defendants-Appellees*
*QUALCOMM INCORPORATED, QUALCOMM ATHEROS, INC.*

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 7,218,907

1. A method for down-converting an electromagnetic signal, comprising:

periodically coupling an electromagnetic signal that includes a carrier signal to an energy storage device and a load, wherein the periodic couplings occur at a rate less than twice the frequency of the carrier signal;

providing, during the periodic couplings, energy from the electromagnetic signal to the energy storage device, thereby changing an amount of energy stored by the energy storage device;

providing, during the periodic couplings, energy from the electromagnetic signal to the load; and

providing, between the periodic couplings, energy from the energy storage device to the load, thereby changing the amount of energy stored by the energy storage device;

whereby the energy provided to the load forms a down-converted signal.

## U.S. Patent No. 6,091,940

22. An apparatus for communicating comprising:

(a) a transmitting subsystem comprising:

(1) a switch module having a first input connected to a bias signal, a control input connected to a control signal, and an output generating a periodic signal, wherein said control signal is an oscillating signal, said control signal causing said switch module to gate said bias signal, said periodic signal having an amplitude that is a function of said bias signal, and said periodic signal being a harmonically rich signal comprised of a plurality of harmonics, and

(2) a filter to accept said harmonically rich signal and to output one or more desired harmonics from said plurality of harmonics; and

i

(b) a receiving subsystem.

24. The apparatus of claim 22, wherein said receiving subsystem comprises:

an aliasing module, further comprising:

(1) a universal frequency translation (UFT) module, said UFT module aliasing an electromagnetic signal according to an aliasing signal having an aliasing rate to down-convert said electromagnetic signal, and transferring energy from said electromagnetic signal at said aliasing rate;

(2) a signal generator generating said aliasing signal, said aliasing signal comprising a plurality of pulses having non-negligible apertures; and

(3) a storage device storing energy from said UFT module.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 26-1033 |
| **Short Case Caption** | ParkerVision, Inc. v. Qualcomm Incorporated |
| **Filing Party/Entity** | Qualcomm Incorporated; Qualcomm Atheros, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/23/2025

Signature: /s/ Matthew M. Werdegar

Name: Matthew M. Werdegar

iii

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☑ None/Not Applicable |
| Qualcomm Incorporated | | |
| Qualcomm Atheros, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

iv

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable      ☑    Additional pages attached

| | | |
|---|---|---|
| See attached | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable      ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

v

## ADDENDUM TO QUALCOMM'S FORM 9, QUESTION 4

**4. Legal Representatives**.   List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

| LAW FIRM | ATTORNEYS |
|---|---|
| **Cooley LLP** | Priya B. Viswanath, Patrick Warren Lauppe, Sarah Butler Moore (former), Stephen R. Smith, Benjamin Damstedt (former), Benjamin S. Lin (former), Jeffrey Scott Karr, Stephen C. Neal, Erin C. Trenda, Timothy S. Teter (former) |
| **Carlton Fields, P.A.** | Daniel C. Johnson |
| **Bedell, Dittmar, DeVault, Pillans & Coxe, PA** | John Andrew DeVault, III, Michael E. Lockamy, Courtney Kneece Grimm (former) |
| **Cadwalader, Wickersham & Taft, LLP** | Howard Wizenfeld |

# TABLE OF CONTENTS

CLAIM LANGUAGE AT ISSUE ......................................................... i

CERTIFICATE OF INTEREST ......................................................... iii

TABLE OF CONTENTS ................................................................. vii

STATEMENT OF RELATED CASES ................................................. 1

INTRODUCTION .......................................................................... 1

STATEMENT OF JURISDICTION ................................................... 5

ISSUES PRESENTED .................................................................... 6

COUNTERSTATEMENT OF THE CASE ........................................... 7

      A.     Factual background ......................................................... 7

      B.     Procedural history ......................................................... 9

            1.     The claims still at issue ...................................... 9

            2.     This Court vacated the district court's summary judgment order ............................................... 10

            3.     On remand, Qualcomm asked the district court to construe the disputed terms ................................ 11

            4.     The claim construction proceedings and order ................. 12

            5.     The district court granted ParkerVision's request for partial final judgment under Rule 54(b) over Qualcomm's objections ....................................... 17

SUMMARY OF THE ARGUMENT .................................................. 18

ARGUMENT ............................................................................... 20

      A.     ParkerVision has failed to establish jurisdiction, and the Court should dismiss this appeal ................................... 20

            1.     Rule 54(b) does not provide jurisdiction ...................... 20

2. ParkerVision's alternative bases for jurisdiction lack merit ...................................................................25

B. The district court correctly construed the disputed limitations in the '907 and '940 patents .....................................28

1. Claim 1 of the '907 patent claims a method "whereby the energy provided to the load *generates* a down-converted signal" ....................................29

2. Claim 24 of the '940 patent claims an apparatus with "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal" .......................................................40

C. ParkerVision's arguments ignore the clear dispute over claim scope, rely on new claim constructions ParkerVision failed to raise below, and mischaracterize the issues on appeal ...................................................................46

1. The parties have an actual dispute over claim scope that requires construction .........................................47

2. ParkerVision implicitly—and improperly— argues for alternative constructions of two *new* terms ....................................................................................50

3. ParkerVision mischaracterizes the claim construction issue on appeal ..............................................53

D. ParkerVision's extraordinary request for judicial reassignment is baseless .............................................................56

CONCLUSION ................................................................................................62

CERTIFICATE OF COMPLIANCE.................................................................64

CERTIFICATE OF SERVICE ........................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Ala. Aircraft Indus., Inc. v. Boeing Co.*,
  133 F.4th 1238 (11th Cir. 2025) ...................................................................58

*Bergstrom v. Sears, Roebuck & Co.*,
  599 F.2d 62 (8th Cir. 1979) .........................................................................27

*Clark v. Coats & Clark, Inc.*,
  990 F.2d 1217 (11th Cir. 1993) ..............................................................58, 59

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ...................................................................52

*CSX Transp., Inc. v. State Bd. of Equalization*,
  521 F.3d 1300 (11th Cir. 2008) ..............................................................57, 62

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
  446 U.S. 1 (1980) .................................................................................20, 26

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001) ...................................................................30

*Donnelly Corp. v. Gentex Corp.*,
  95 F.3d 1168, 1996 WL 468452 (Fed. Cir. 1996) ......................................20, 24

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016) ..............................................................48, 49

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) ...................................................................23

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009) ...................................................................47

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ...................................................................52

*Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*,
  57 F.4th 1001 (Fed. Cir. 2023) ..............................................................44, 50

*Hallco Mfg. Co. v. Foster*,
  256 F.3d 1290 (Fed. Cir. 2001) ............................................................23, 24

*Houston Indus. Inc. v. United States*,
  78 F.3d 564 (Fed. Cir. 1996) ......................................................................21

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018) ............................................................49, 50

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ..................................................................52

*Liberty Mut. Ins. Co. v. Wetzel*,
  424 U.S. 737 (1976)......................................................................................28

*Liteky v. United States*,
  510 U.S. 540 (1994)......................................................................................58

*Local P–171, Amalgamated Meat Cutters & Butcher Workmen of N.
  Am. v. Thompson Farms Co.*,
  642 F.2d 1065 (7th Cir. 1981) ....................................................................21

*Lucent Techs., Inc. v. Gateway, Inc.*,
  543 F.3d 710 (Fed. Cir. 2008) ....................................................................23

*MySpace v. GraphOn*,
  672 F.3d 1250 (Fed. Cir. 2012) ..................................................................45

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
  521 F.3d 1351 (Fed. Cir. 2008) ..................................................19, 47, 48, 49

*Orenshteyn v. Citrix Sys., Inc.*,
  691 F.3d 1356 (Fed. Cir. 2012) ..................................................................26

*Otto Candies, LLC v. Citigroup Inc.*,
  137 F.4th 1158 (11th Cir. 2025) ................................................................56

*ParkerVision, Inc. v. Qualcomm Inc.*,
  116 F.4th 1345 (Fed. Cir. 2024) ("*ParkerVision II*").................................*passim*

*ParkerVision, Inc. v. Qualcomm Inc.*,
  2022 WL 1230505 (M.D. Fla. Mar. 22, 2022) ..........................................10

*ParkerVision, Inc. v. Qualcomm Inc*,
 621 F. App'x 1009 (Fed. Cir. 2015) ("*ParkerVision I*") .............................*passim*

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................................*passim*

*Portney v. CIBA Vision Corp.*,
 401 F. App'x 526 (Fed. Cir. 2010) .........................................................................27

*Rsch. Corp. Techs. v. Microsoft Corp.*,
 536 F.3d 1247 (Fed. Cir. 2008) ..............................................................................59

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
 8 F.4th 1285 (Fed. Cir. 2021) ...................................................................36, 37, 52

*Senju Pharm. Co. v. Apotex Inc.*,
 746 F.3d 1344 (Fed. Cir. 2014) ..............................................................................23

*Smithkline Beecham Corp. v. Apotex Corp.*,
 2004 WL 634867 (E.D. Pa. Mar. 26, 2004) ...................................................24, 25

*SmithKline Beecham Corp. v. Apotex Corp.*,
 439 F.3d 1312 (Fed. Cir. 2006) ..............................................................................22

*Sovereign Mil. Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers*,
 809 F.3d 1171 (11th Cir. 2015) .......................................................................57, 58

*Straight Path IP Grp. Inc. v. Sipnet EU S.R.O.*,
 806 F.3d 1356 (Fed. Cir. 2015) ..............................................................................49

*Trs. of Columbia Univ. v. Symantec Corp.*,
 811 F.3d 1359 (Fed. Cir. 2016) ..............................................................................49

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*,
 127 F.4th 1340 (Fed. Cir. 2025) .............................................................................60

*TruePosition, Inc. v. Polaris Wireless, Inc.*,
 2015 WL 887935 (D. Del. Mar. 3, 2015) ...............................................................24

*U.S. Fid. & Guar. Co. v. Arch Ins. Co.*,
 578 F.3d 45 (1st Cir. 2009)......................................................................................21

*Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*,
    338 F.3d 1353 (Fed. Cir. 2003) ...............................................................27

*United States v. Gupta*,
    572 F.3d 878 (11th Cir. 2009) .................................................................62

*United States v. Martin*,
    455 F.3d 1227 (11th Cir. 2006) ...............................................................59

*United States v. Torkington*,
    874 F.2d 1441 (11th Cir. 1989) .....................................................56, 59, 62

*W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*,
    975 F.2d 858 (Fed. Cir. 1992) .............................................................5, 22

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ...............................................................44

## Federal Statutes

28 U.S.C. § 1292(b) ...................................................................6, 26, 27, 28

28 U.S.C. § 1295(a)(1) .........................................................................6

35 U.S.C. § 271(a) ...............................................................................23

35 U.S.C. § 281 ...............................................................................22, 23

## Rules

Fed. R. Civ. P. 54(b) ...................................................................*passim*

## STATEMENT OF RELATED CASES

This Court previously decided one appeal in this action, vacating the district court's entry of summary judgment for Qualcomm, revising the district court's grant of *Daubert* motions relating to ParkerVision's validity and infringement experts, and remanding for further proceedings. *ParkerVision, Inc. v. Qualcomm Inc.*, 116 F.4th 1345, Nos. 2022-1755, 2024-2221 (Fed. Cir. 2024) (before Lourie, Mayer, and Stark, Circuit Judges) ("*ParkerVision II*").

## INTRODUCTION[1]

For more than a decade, ParkerVision has pursued infringement claims against Qualcomm across multiple forums, asserting scores of patent claims and theories. Yet despite repeated opportunities—in district court, at the International Trade Commission, and before this Court—ParkerVision has never established that any Qualcomm product infringes a single asserted claim.

This appeal represents the latest chapter of that long-running campaign. It arises not from a final judgment, but from a careful claim construction process on remand—one that ParkerVision resisted, lost on the merits, and now seeks to undo by asking this Court to cast aside established jurisdictional principles and settled claim construction law.

---

[1] In citations, all internal quotation marks, citations, and alterations have been omitted and all emphases added, unless otherwise noted.

As a threshold matter, this appeal never should have been certified. The district court entered partial summary judgment of noninfringement of the asserted claims of U.S. Patent No. 7,218,907 (the "'907 patent") and two "receiver" claims of U.S. Patent No. 6,091,940 (the "'940 patent") after construing two disputed limitations. Other asserted claims of the '940 patent—method claims directed to related transmitter technology—remain pending before the district court. Nonetheless, at ParkerVision's urging, the district court certified its partial ruling under Federal Rule of Civil Procedure 54(b). ParkerVision now asks this Court to review that fragment of a still-pending patent cause of action.

Rule 54(b) does not permit piecemeal appeals of individual patent claims within a single count of infringement. As this Court has long recognized, in the civil procedure context the term "claim" refers to a cause of action—not an individual patent claim within a patent. A patent infringement action asserts one claim for relief per *patent*, not one per asserted patent *claim*. Here, ParkerVision's cause of action for infringement of the '940 patent remains unresolved. Because there has been no final disposition of that cause of action, there is no appellate jurisdiction. The appeal should be dismissed.

Even if this Court had jurisdiction, ParkerVision's substantive arguments lack merit.

2

This Court previously vacated summary judgment of noninfringement because the district court had not undertaken the claim construction analysis required by *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). On remand, the district court did exactly what this Court instructed: it ordered supplemental briefing, examined the claim language, specifications, and extrinsic evidence, and issued a detailed *Markman* order construing two disputed limitations.

For the '907 patent, the court construed the phrase "whereby the energy provided to the load forms a down-converted signal" to mean "whereby the energy provided to the load generates a down-converted signal." For the '940 patent, the court construed "a storage device storing energy from said UFT module" to mean "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal." Those constructions are based on what the claims say, what the specifications teach, and what even ParkerVision's own inventors and experts have acknowledged: the alleged inventions are premised on transferring energy into a storage device and using that stored energy to generate the down-converted output.

Faced with this unequivocal record, ParkerVision advances two inconsistent positions. First, ParkerVision contends that no construction is required at all—that a jury should try to determine the disputed terms' "plain and ordinary meaning." But this Court has repeatedly held that where parties present a genuine dispute over claim

3

scope, the court—not the jury—must resolve it. The parties sharply disagree about whether the disputed claim terms call for generating a down-converted signal from stored energy or, for the '907 patent, calls for merely shaping an already-existing signal, and for the '940 patent, leaving the claimed stored energy purposeless surplusage. This is not a dispute for the jury. The district court properly resolved it as a matter of law.

Second, recognizing that some construction is unavoidable, ParkerVision attempts to recast the dispute around two different terms—"periodic coupling" and "UFT module." Under the guise of "explaining" the patents, ParkerVision offers new theories of how these terms supposedly assign down-conversion to switches alone, independent of energy storage. But ParkerVision's proposed *de facto* constructions of these terms were never presented below. This Court's precedent on forfeiture is clear: arguments not raised in the trial court are not entertained for the first time on review.

Regardless, ParkerVision's new theories cannot be reconciled with the intrinsic and extrinsic evidence. Both specifications describe the use of stored energy to form or generate the down-converted signal. And ParkerVision's own experts testified that the receiver claims require producing a down-converted signal using energy transferred into a storage medium. The district court's constructions are dictated by the intrinsic evidence and confirmed by the extrinsic evidence;

ParkerVision's belated "constructions" are contradicted by the evidentiary record.

Finally, ParkerVision asks this Court to reassign the case to a different district judge. Reassignment is a drastic remedy reserved for circumstances involving clear bias, defiance of appellate mandates, or conduct that undermines the appearance of justice. Nothing of the sort occurred here. The district court followed this Court's remand instructions, conducted claim construction under *Phillips*, and issued a carefully reasoned opinion. That ParkerVision disagrees with the outcome does not establish partiality; nor do ordinary expressions of frustration in a decade-old, highly technical patent case.

In sum, ParkerVision's latest ploy fails. There is no appellate jurisdiction. Even if there were, the district court's constructions faithfully applied *Phillips*. ParkerVision's attempt to avoid those constructions—by recasting the procedural posture, shifting theories on appeal, and seeking judicial reassignment—should be rejected.

## STATEMENT OF JURISDICTION

ParkerVision's jurisdictional statement is incorrect. The district court's resolution of less than all asserted patent claims in a patent-in-suit is not an "ultimate disposition of an individual claim" and does not provide a basis for jurisdiction under Rule 54(b). *W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*, 975 F.2d 858, 862 (Fed. Cir. 1992). The order on appeal is not an appealable final

judgment under 28 U.S.C. § 1295(a)(1). And it is not an appealable interlocutory order under 28 U.S.C. § 1292(b) or the Court's exercise of pendent jurisdiction.

## ISSUES PRESENTED

1.  Whether the Court lacks jurisdiction to consider ParkerVision's appeal when there has been no final judgment adjudicating all asserted claims of the '940 patent.

2.  Whether the district court correctly construed the '907 patent claim term "whereby the energy provided to the load forms a down-converted signal" (the "forms" claim term).

3.  Whether the district court correctly construed the '940 patent claim term "a storage device storing energy from said UFT module" (the "storage device" claim term).

4.  Whether, given the parties' clear dispute over claim scope, the Court should leave it to a jury to ascertain the "plain and ordinary meaning" of disputed terms.

5.  Whether ParkerVision forfeited the claim construction arguments and implicit constructions that it failed to develop below and raises for the first time in this appeal.

6.  Whether the Court should reject ParkerVision's request to reassign this case to a different district judge.

6

# COUNTERSTATEMENT OF THE CASE

## A.    Factual background

Since first suing fifteen years ago, ParkerVision has asserted more than 100 claims from over 20 patents against Qualcomm. Yet ParkerVision has been unable to prove that any Qualcomm product infringes. ParkerVision's latest loss is the subject of this appeal. Following the district court's construction of two disputed claim terms, ParkerVision stipulated to summary judgment of noninfringement of the asserted claims of the '907 patent and some of the asserted claims of the '940 patent.

The summarily adjudicated claims of the '907 and '940 patents pertain to down-converting electromagnetic signals. "'Down-converting' refers to converting a modulated high-frequency electromagnetic signal into a low-frequency or 'baseband' signal in an electronic device such as a wireless receiver." *ParkerVision II*, 116 F.4th at 1349. ParkerVision claims to have developed a new process for down-converting that it calls "energy sampling." *Id.* ParkerVision's "energy sampling" down-conversion system "consists of an electronic switch [8206] connected on one end to an input electromagnetic signal [8204] and on the other end to a storage capacitor [8208]," as shown below.



FIG. 82A

*Id.* at 1349-50.[2]

Qualcomm disagrees with the inaccurate and disputed assertions in the "Technological Context" and "Factual Background" sections of ParkerVision's Statement of the Case. BlueBr8-16. ParkerVision's purported summary of the teachings of the '907 and '940 patents conflicts with the evidence and ignores the explicit role that energy storage plays in ParkerVision's "energy sampling" invention. As detailed *infra*, the intrinsic and extrinsic evidence establish that ParkerVision's invention, as claimed in the '907 and '940 patents, works by

---

[2] While this Court cited Figure 82A of ParkerVision's U.S. Patent No. 6,061,551 (the "'551 patent") in describing ParkerVision's "energy sampling" system, the '907 patent is a continuation-in-part of the '551 patent and incorporates by reference the '551 patent. Appx345 (1:7-18). Figure 82A in the '907 patent is identical to Figure 82A in the '551 patent. *Compare* Appx264 ('907 patent, Fig. 82A), *with* Appx1115 ('551 patent, Fig. 82A).

transferring energy from the electromagnetic signal into an energy storage device and using that stored energy to generate or produce a down-converted baseband signal. ParkerVision's attempt to characterize the patents as claiming down-conversion by switches alone cannot be squared with the claim language or specifications.

## B. Procedural history

This Court summarized the parties' "litigation saga" in *ParkerVision II*. 116 F.4th at 1349-54. Qualcomm does not repeat that entire byzantine procedural history but instead focuses on relevant events leading up to and after *ParkerVision II*.

### 1. The claims still at issue

Of eleven patents originally asserted by ParkerVision, two remain: the '907 and the '940. Appx5-6. As to the '940, ParkerVision accuses Qualcomm of infringing six claims: 24-26, 331, and 368-69. Claims 24 and 331 are directed to a communication apparatus with transmitting and receiving subsystems (referred to below as the "Receiver Claims" and at issue here). Claims 25, 26, 368, and 369 are directed to a method for using related transmitter technology (referred to below as the "Transmitter Claims" and still pending below). Appx5-6, Appx9 (n.3). ParkerVision accuses the same products of infringing all asserted '940 patent claims. Appx16312-16315.

**2. This Court vacated the district court's summary judgment order**

In March 2022, the district court granted summary judgment of noninfringement in favor of Qualcomm on collateral estoppel grounds and granted Qualcomm's motions to exclude certain testimony of ParkerVision's validity and infringement experts. *ParkerVision, Inc. v. Qualcomm Inc.*, 2022 WL 1230505 (M.D. Fla. Mar. 22, 2022). ParkerVision appealed, and in *ParkerVision II*, this Court vacated judgment of noninfringement, reversed the exclusion of testimony, and remanded for further proceedings. 116 F.4th at 1364.

In vacating the noninfringement judgment, the Court stated that "the district court erred by failing to assess claim scope by conducting claim construction according to the process we set out in *Phillips*." *Id.* at 1357. The Court further stated that on remand, the district court "should undertake any necessary claim construction and then determine whether the receiver claims asserted in this case have the same requirement as the generating limitation of the claims at issue in *ParkerVision I*." *Id.* at 1360. In so holding, the Court referenced the parties' dispute over the scope of the "forms" and "storage device" claim terms but explained that "[w]hile claim construction is ultimately a question of law, in this appeal we are not well positioned to undertake claim construction in the first instance." *Id.* at 1359-60.

### 3. On remand, Qualcomm asked the district court to construe the disputed terms

Upon remand, Qualcomm asked for further claim construction consistent with this Court's instructions. The district court initially denied Qualcomm's request. *See* Appx18802. Qualcomm moved for reconsideration. Appx18798, Appx18807-18808. Qualcomm explained that vis-à-vis the "forms" limitation, the parties had an actual dispute about "whether . . . the energy provided to the load generates a down-converted signal or whether the energy provided to the load shapes an already existing down-converted signal." Appx18821. Qualcomm further explained that vis-à-vis the "storage device" limitation, the parties disputed whether the energy in the storage device is used to generate a down-converted signal, or whether the storage device merely stores energy from the UFT module for no purpose. Appx18833.

In opposition, ParkerVision had ample opportunity to offer its own proposals regarding the meaning of the "forms" and "storage device" terms. It never did. Nor did ParkerVision seek a construction of the "UFT module" term in the '940 patent or the "periodic coupling" term in the '907—terms on which it now relies in support of its positions on appeal. Instead, ParkerVision insisted that *no* construction was required because any construction of the "forms" and "storage device" limitations to "read in" a "generating" limitation was foreclosed by *ParkerVision II* and the denial of Qualcomm's original collateral estoppel summary judgment motion. *See, e.g.,* Appx18869 ("Qualcomm now seeks to avoid an infringement finding by reading

11

into the claims . . . a limitation which the Federal Circuit has clearly rejected."); Appx18867 ("This [district court] already determined that the scope of the asserted receiver claims are materially different from the claims at issue in [] *ParkerVision I* when it denied Qualcomm's Motion for Partial Summary Judgment.").

Rejecting ParkerVision's arguments, the district court granted Qualcomm's motion for reconsideration and ordered the parties to file supplemental claim construction briefs. Appx18987-18988. The parties thereafter submitted briefs addressing the contested limitations. Appx18989-19055.

### 4. The claim construction proceedings and order

#### a. Qualcomm's brief properly focused on intrinsic evidence and supporting extrinsic evidence

In support of its proposed construction that "whereby the energy provided to the load forms a down-converted signal" ('907 patent) means "whereby the energy provided to the load generates a down-converted signal," Qualcomm focused on the claim language itself, which first introduces the "down-converted signal" when describing the result of providing energy to the load (and not in connection with the "periodic couplings" described earlier in the claim, as ParkerVision now contends). Appx19020-19021. Qualcomm then demonstrated that other intrinsic evidence confirmed its construction and that the term "forms" is consistently used in a way that is synonymous with "generating." Appx19022-19023.

Qualcomm also explained that the extrinsic evidence upon which

ParkerVision had relied in earlier proceedings was "not only fundamentally inconsistent with the intrinsic evidence, [but] also falls apart upon closer scrutiny." Appx19024-19028. For example, Qualcomm explained that Dr. Allen's summary judgment declaration, which ParkerVision relied on previously, points to Figure 126A to show that the down-converted signal could be generated by the switch— but ParkerVision omitted the critical fact that Figure 126A shows a voltage-mode embodiment of the claimed invention. Because a voltage signal "is the same everywhere along an electric wire," it makes no sense to suggest that the down-converted signal was "downstream" of the switch or "upstream" of the storage. Appx19025-19026 (quoting *ParkerVision, Inc. v. Qualcomm Inc*, 621 F. App'x 1009, 1015-16 (Fed. Cir. 2015) ("*ParkerVision I*")).

In support of its proposed construction that "a storage device storing energy from said UFT module" ('940 patent) means "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal," Qualcomm likewise focused on the intrinsic evidence. Appx19030. Qualcomm also showed that its proposed construction was supported by extrinsic evidence, including the inventors' descriptions of their invention and both parties' experts' interpretations of the claim. Appx19031-19032.

### b. ParkerVision's brief focused on interpreting *ParkerVision II* and rearguing collateral estoppel

In its claim construction brief, ParkerVision proposed "plain and ordinary meaning" for the "forms" term ('907 patent) and no construction at all for the "storage device" term ('940 patent). Appx18994, Appx19005. ParkerVision reiterated its position that "no new claim construction of any term is warranted." Appx18992. Just as it had when opposing reconsideration, ParkerVision argued that "because the Federal Circuit and [the district court] have determined that the claims at-issue here are different from the claims at-issue in *ParkerVision I as a matter of law*, it has already been decided that the claims at-issue here do not require a generating limitation." Appx18994.

### c. The district court's *Markman* Order adopted Qualcomm's proposed constructions

On May 29, 2025, the district court issued a 22-page order addressing the disputed claim terms. Appx7. In its order, the court observed that while Qualcomm "submitted a claim construction brief," ParkerVision "submitted a brief fashioned like a response to a motion for summary judgment." Appx11. In particular, the court noted that in discussing the '907 patent, ParkerVision "did not offer an interpretation of the intrinsic evidence and instead relied on the conclusions found in the declaration of its expert witness, Dr. Allen, along with counsel's interpretation of the Federal Circuit's opinion in this matter, and this [district c]ourt's denial of

Defendant's motion for partial summary judgment on collateral estoppel from 2020." Appx10-11. The court explained that ParkerVision's discussion of the '940 patent took the same "confounding" approach, "rel[ying] on extrinsic evidence, including its Opening Appellate Brief, which is not part of the . . . record." *Id*.

Despite these shortcomings, the district court carefully considered ParkerVision's arguments—and ultimately rejected them because they were not grounded in the intrinsic evidence. *See, e.g.*, Appx22, Appx27. For example, the court noted that the figure ParkerVision relied on for its "forms" argument "does not originate from the specification but was created by its retained expert." Appx19. The court also explained that, while Dr. Allen's declaration "was sufficient to create a material issue of fact precluding summary judgment," "[it] constitutes extrinsic evidence in a claim construction proceeding[.]" Appx22.

In rejecting ParkerVision's argument that *ParkerVision II* had already resolved the dispute over the "forms" limitation, the district court observed that this Court had not construed the term to exclude generating but simply noted that generating "is not *expressly* recited." Appx20 (emphasis in original). The district court also explained that "the Federal Circuit did not hold that Qualcomm's reliance on the '907 patent specification does not support its construction of claim 1 as teaching a generating limitation. The Federal Circuit merely found that the overlap between the two patents is not enough to support collateral estoppel." Appx23.

15

In its analysis of the '940 limitation, the district court again rejected ParkerVision's argument that *ParkerVision II* forecloses a determination that the patents include a generating limitation. Appx26. The court also rejected ParkerVision's argument that "no intrinsic evidence supports Qualcomm's proposed construction," finding it "conclusory" because ParkerVision cited its appellate brief in *ParkerVision II* without citing the patent itself. Appx27. The court further noted that "ParkerVision conveniently ignores the specification cited by Qualcomm and disregards the testimony of its inventors and experts, all of which teach that the energy stored in the storage device is used to generate the down-converted signal." *Id.*

Ultimately, the district court adopted Qualcomm's proposed constructions:

| Claim Term | District Court's Construction |
|---|---|
| "whereby the energy provided to the load forms a down-converted signal" ('907 patent) | "whereby the energy provided to the load generates a down-converted signal" |
| "a storage device storing energy from said UFT module" ('940 patent) | "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal" |

Appx23, Appx27-28.

**5. The district court granted ParkerVision's request for partial final judgment under Rule 54(b) over Qualcomm's objections**

Based on the district court's claim constructions, the parties stipulated to noninfringement of the asserted claims of the '907 patent and claims 24 and 331 of the '940 patent and requested entry of partial summary judgment in Qualcomm's favor on those claims. Appx19056. The parties excluded asserted claims 25, 26, 368, and 369 of the '940 patent from the request. Appx19058.

Thereafter, ParkerVision moved under Rule 54(b) for partial final judgment of the district court's summary adjudication of the '907 patent and claims 24 and 331 of the '940 patent. Appx19069, Appx19073. ParkerVision requested that the district court stay the other asserted claims of the '940 patent. *Id.* Qualcomm opposed, citing the lack of finality on ParkerVision's '940 patent cause of action, as well as the existence of just reasons to delay an appeal, including: the inevitability of another post-trial appeal addressing the validity of the same patent and infringement of the same accused products; the further delay in resolving this dispute; and the growing risks of witness unavailability and fading memories more than two decades after the events underlying ParkerVision's allegations. Appx19107, Appx19111. ParkerVision replied. Appx19143.

On August 21, 2025, the district court entered partial summary judgment in Qualcomm's favor as to the '907 patent and claims 24 and 331 of the '940 patent. Appx31. On October 2, 2025, the district court granted ParkerVision's Rule 54(b)

motion. Appx5-6. In so doing, the district court agreed with ParkerVision's argument that this Court "can quickly dismiss the appeal if it determines the Receiver Claims and the Transmitter Claims [of the '940 patent] constitute a single cause of action such that certification is improper." Appx4-5.

## SUMMARY OF THE ARGUMENT

ParkerVision has failed to satisfy a threshold requirement: jurisdiction. This Court lacks jurisdiction because ParkerVision obtained only partial judgment on a subset of asserted patent claims, while other asserted patent claims from the *same* patent-in-suit and *same* cause of action remain pending in the district court. That partial judgment does not constitute a final judgment under Rule 54(b), and there is no other legitimate basis for appellate jurisdiction.

Even if this Court had jurisdiction, ParkerVision's substantive arguments fail. The district court's constructions reflect a careful application of the *Phillips* framework. The claim language, specifications, and relevant extrinsic evidence, including the testimony of ParkerVision's own experts and inventors, all support the court's constructions.

Seeking to undo the district court's careful work, ParkerVision argues that the jury should be left to ascertain the plain and ordinary meaning of the disputed claim terms. But that argument is belied by ParkerVision's own brief, which makes clear that there is an actual dispute regarding claim scope. And it flies in the face of this

18

Court's precedent that once "parties raise an actual dispute regarding the proper scope of [] claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

In an implicit concession that claim construction is indeed required, ParkerVision also advances new arguments on appeal regarding the meaning of two other claim terms: "UFT module" ('940 patent) and "periodic coupling" ('907 patent)—effectively seeking construction of these terms under the guise of explaining the true meaning of the asserted patents. But ParkerVision declined to present these arguments below and thus has forfeited them. Furthermore, its belated arguments are inconsistent with the intrinsic and extrinsic evidence.

ParkerVision's related attempt to reframe the issue before this Court as whether the down-converted signal is generated "at or after" the storage device likewise lacks merit. The issue here, as it was before the district court, is whether the down-converted signal is generated using energy from the storage device. Qualcomm never argued —and the district court never held —that down-conversion must occur "at or after" the claimed storage device or at any other location.

Finally, the Court should deny ParkerVision's extraordinary request to reassign this case to a different district court judge. ParkerVision has failed to establish that *any* factor in the Eleventh Circuit's test supports reassignment.

## ARGUMENT

### A. ParkerVision has failed to establish jurisdiction, and the Court should dismiss this appeal

The Court should dismiss this appeal for lack of appellate jurisdiction for the reasons set forth in Qualcomm's motion to dismiss. *See* ECF14, 20. ParkerVision obtained only partial judgment on a subset of asserted patent claims, while other asserted patent claims from the *same* patent-in-suit and the *same* cause of action remain pending below. That partial judgment does not constitute a final judgment under Rule 54(b), and there is no other basis for appellate jurisdiction.

### 1. Rule 54(b) does not provide jurisdiction

To qualify as a final judgment under Rule 54(b), an order "must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980). The district court's partial summary judgment on the '940 patent satisfies neither prerequisite.

The partial summary judgment is not a "judgment," because it is not a complete decision on a cognizable claim for relief, *i.e.*, ParkerVision's cause of action for "Infringement of the '940 Patent." Appx576. "The term 'claim' as used in Rule 54(b) refers . . . to a claim in a cause of action, not to individual patent claims." *Donnelly Corp. v. Gentex Corp.*, 95 F.3d 1168 (Table), 1996 WL 468452, at *3 (Fed.

Cir. 1996). And "[t]he resolution of individual issues within a claim does not satisfy the requirements of Rule 54(b)." *Houston Indus. Inc. v. United States*, 78 F.3d 564, 567 (Fed. Cir. 1996). This is true even if "the facts and legal theory underlying the issue are distinct from the facts and legal theories underlying the remaining unresolved issues." *Id*.

The partial summary judgment also is not "final." Even if this Court affirms the district court's summary adjudication of claims 24 and 331 of the '940 patent, the final resolution of ParkerVision's '940 patent infringement cause of action depends on a jury's verdict on the claims still pending before the district court. A jury may still find that the same Qualcomm products infringe the '940 patent via the remaining claims, and it may still award ParkerVision damages for infringement of the '940 patent based on those claims. *Cf. Local P–171, Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Thompson Farms Co.*, 642 F.2d 1065, 1070-71 (7th Cir. 1981) ("At a minimum, claims cannot be separate unless separate recovery is possible on each.").

Although ParkerVision bears the burden of establishing appellate jurisdiction, *see e.g., U.S. Fid. & Guar. Co. v. Arch Ins. Co.*, 578 F.3d 45, 55 (1st Cir. 2009) ("[T]he burden of establishing appellate jurisdiction rests with the party who asserts its existence."), its Statement of Jurisdiction conspicuously fails to address the

finality requirement of Rule 54(b).[3] ParkerVision instead frames the issue as only whether the district court abused its discretion in ruling that the '940 patent claims on appeal "are separate enough" from those pending below "to allow a Rule 54(b) judgment." BlueBr4. But "[c]ourts analyzing whether Rule 54(b) applies must focus on *both* the finality of the judgment and the separateness of the claims for relief." *W.L. Gore*, 975 F.2d at 862. Furthermore, because "[t]he requirement of finality is a statutory mandate and not a matter of discretion, . . . when an appeal is certified pursuant to Rule 54(b)," this Court reviews "the finality of the judgment *de novo*." *Id.*

Even if the Court were to construe ParkerVision's jurisdictional statement as addressing Rule 54(b)'s finality requirement, ParkerVision's contention that individual patent claims asserted in a patent infringement cause of action may be treated as whole causes of action is contrary to the patent statute, this Court's precedent, and the holdings of every other court anyone has identified to consider the issue.

The patent statute creates a single claim, *i.e.*, cause of action, for infringement of a patent, not separate causes of action for each individual claim of the patent. 35

---

[3] ParkerVision purports to preserve the right to address jurisdiction in its reply brief. BlueBr7. But the Court directed the parties to "address the jurisdictional issues" in their briefs, ECF22, and "arguments not raised in the opening brief are waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement *of his patent*."); *id*. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention . . . *infringes the patent*."). Consistent with the statutory language, this Court has held that a patent owner "cannot split up its ownership rights in a patent and assign different claims to different parties." *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 721 (Fed. Cir. 2008). Rather, "property rights, including ownership, attach to patents as a whole, not individual claims." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1466 (Fed. Cir. 1998). This Court has likewise held that a patentee cannot "assert the same patent against the same party and the same subject matter" in successive lawsuits, even if the asserted patent claims are different, and even if the later-asserted claims could not have been asserted earlier. *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1349 (Fed. Cir. 2014).

Additionally, this Court has repeatedly cautioned that the term "claim" has a different meaning in patent law than in civil procedure and it is a mistake to treat the two as coextensive. In *Senju*, for example, this Court explained that "in patent law, a 'claim' is a substantive part of the patent document and plays a critically important role in infringement litigation," while "[*i*]*n civil procedure, . . . 'claim' is equivalent to 'cause of action.*'" *Id.*; *accord Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1294

(Fed. Cir. 2001) ("[T]he term 'claim' has a special meaning in patent law, which meaning is different from 'claim' in general civil procedure . . . .").

Against this backdrop, courts have consistently rejected attempts like ParkerVision's to certify a partial final judgment for *some* patent claims while continuing to litigate other claims of the same patent in district court. For example, in its non-precedential decision in *Donnelly*, this Court vacated the district court's Rule 54(b) certification where claims from the same patent remained pending before the district court. *See* 1996 WL 468452, at *3. As the Court explained there, "it is difficult to imagine a case in which subject matter is sufficiently related to be covered by a single patent, and yet sufficiently distinct as to warrant the grant of a motion for partial final judgment." *Id*.

Similarly, in *TruePosition, Inc. v. Polaris Wireless, Inc.*, the district court denied a Rule 54(b) motion that sought partial final judgment for only two of three asserted patent claims. 2015 WL 887935, at *4 (D. Del. Mar. 3, 2015). The court reasoned that the "three asserted claims must be viewed as part of a single action for relief based on infringement," and because only two of the three had been resolved "the single right of action for relief based on infringement of the [patent] is not final within the meaning of Rule 54(b)." *Id.*

And in *Smithkline Beecham Corp. v. Apotex Corp.*, the district court denied a Rule 54(b) motion arising from a summary judgment that had resolved certain

"product-by-process" claims without resolving "non-product-by-process" claims in the same patent because "an action alleging infringement of multiple claims asserted under a single patent asserts a single claim for purposes of Rule 54." 2004 WL 634867, at *4 (E.D. Pa. Mar. 26, 2004).

In sum, this Court does not have jurisdiction under Rule 54(b) over an appeal of some—but not all—asserted claims within a patent. Just as ParkerVision could not separately assign claims 24 and 331 of the '940 patent or separately accuse the same Qualcomm products and recover damages on those claims, it cannot separately appeal the partial summary judgment on those claims while others remain pending. To hold otherwise would eviscerate Rule 54(b) and open the floodgates to piecemeal appeals of individual asserted patent claims.

### 2. ParkerVision's alternative bases for jurisdiction lack merit

In tacit recognition that the district court's entry of partial final judgment under Rule 54(b) lacks legal support, ParkerVision posits two alternative grounds for jurisdiction. *First*, ParkerVision claims that because the issue of whether there is a final judgment under Rule 54(b) applies only to the '940 patent, "this Court can review the '907 claims under Rule 54(b) and exercise pendent jurisdiction over the '940 claims." BlueBr5. But in advancing this new argument, ParkerVision fails to acknowledge, much less satisfy, the stringent test for exercising pendent jurisdiction. It also mischaracterizes the propriety of a '907-patent-only appeal under Rule 54(b).

"In rare circumstances, the doctrine of pendent appellate jurisdiction allows federal courts of appeal limited discretion to review a ruling that is not independently appealable if jurisdiction exists over another related ruling." *Orenshteyn v. Citrix Sys., Inc.*, 691 F.3d 1356, 1358 (Fed. Cir. 2012). Pendent jurisdiction may be exercised only if the non-appealable decision is either "inextricably intertwined with" or "'necessary to ensure meaningful review of' the appealable decision." *Id.* Neither circumstance applies to the claim constructions here. They are separate constructions of different claim terms in different patents involving different intrinsic and extrinsic evidence. Indeed, ParkerVision's own Opening Brief makes plain that the two constructions are distinct, devoting separate sections to each. *See* BlueBr33-54.

Moreover, even if pendent jurisdiction were warranted, ParkerVision is wrong that a '907 patent-only appeal is appropriate under Rule 54(b). In the proceedings below, ParkerVision never requested, and the district court never considered, a '907-patent-only appeal, which raises very different "no just reason for delay" considerations. *See Curtiss-Wright*, 446 U.S. at 8 ("[I]n deciding whether there are no just reasons to delay the appeal of individual final judgments . . . a district court must take into account judicial administrative interests as well as the equities involved."). Indeed, ParkerVision itself calls proceeding on just the '907 patent illogical and inefficient. ECF16 at 5-6. What ParkerVision asked for, and what the

court certified, was an appeal of a cross-patent amalgam of "receiver" claims that improperly splits ParkerVision's '940 patent cause of action in two.

*Second*, ParkerVision argues that, even though the district court's partial final judgment invokes only Rule 54(b), this Court may nonetheless exercise jurisdiction under 28 U.S.C. § 1292(b). This alternative also lacks legal support. Even when properly invoked, "[t]his court has generally refrained from granting § 1292(b) petitions to resolve claim construction disputes, instead, leaving such matters to be determined after entry of final judgment." *Portney v. CIBA Vision Corp.*, 401 F. App'x 526, 529 (Fed. Cir. 2010). And ParkerVision can point to only one case in which a court has treated a defective Rule 54(b) appeal as an interlocutory appeal under Section 1292(b). BlueBr6 (citing *Bergstrom v. Sears, Roebuck & Co.*, 599 F.2d 62 (8th Cir. 1979)). Moreover, in ParkerVision's lone case, *Bergstrom*, the court agreed to this "unusual procedure" only because "it appear[ed] that the trial court would have certified the interlocutory order under 28 U.S.C. § 1292(b) and this Court would have accepted jurisdiction." *Id.* at 64. Here, in contrast, ParkerVision never asked the district court to consider certification under Section 1292(b), Appx19069-19086, and the court's order does not address the standards for such a certification. Appx1-6; *Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1357 (Fed. Cir. 2003) ("Jurisdiction pursuant to § 1292(b) . . . requires a separate and distinct certification from that required under Rule 54(b)[.]").

Furthermore, ParkerVision did not timely apply to this Court, as required. *Cf. Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 745 (1976) ("Although the District Court's findings made with a view to satisfying Rule 54(b) might be viewed as substantial compliance with the [Section 1292(b)] certification requirement . . . , there is no showing . . . that petitioner made application to the Court of Appeals within the 10 days therein specified.").

Because ParkerVision failed to establish any basis for jurisdiction, the Court should dismiss this appeal in its entirety.

**B.    The district court correctly construed the disputed limitations in the '907 and '940 patents**

On the merits, should the Court reach them, the district court correctly construed: (1) the '907 patent term "whereby the energy provided to the load forms a down-converted signal" to mean "whereby the energy provided to the load *generates* a down-converted signal"; and (2) the '940 patent term "a storage device storing energy from said UFT module" to mean "a storage device storing energy from said UFT module and *using that energy to generate a down-converted signal*."[4] Appx7-28. The court's constructions of these limitations correctly reflect how the terms are used in the claims and specifications. In addition, extrinsic evidence

---

[4] Consistent with the district court's order, argument for the '907 patent is presented first, followed by argument for the '940 patent.

confirms that a person of skill in the art would have understood the terms in accordance with these constructions.

**1.  Claim 1 of the '907 patent claims a method "whereby the energy provided to the load *generates* a down-converted signal"**

**a.  Intrinsic evidence confirms the district court's construction**

As the Court observed in *ParkerVision II*, "[t]he proper approach to determining claim scope is to look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, [and] the specification . . . ." 116 F.4th at 1357. Applying this approach, the district court correctly found that the intrinsic evidence requires the construction that "forms" means "generates" in the '907 patent claim 1 limitation "whereby the energy provided to the load forms a down-converted signal." Appx18.

*First*, the claim language itself confirms the district court's construction. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). And beyond the words of claim 1, the context in which the disputed term is used within the claim further confirms the court's construction. *Id.* ("[T]he context in which a term is used in the asserted claim can be highly instructive."). The disputed term is the last limitation in claim 1, and critically, that limitation *first* introduces the concept of a down-converted signal.

ParkerVision argues that the "energy" provided to the load in claim 1's final limitation is already the claimed "down-converted signal." BlueBr46; Appx16. In

other words, ParkerVision argues that the down-converted signal is somewhere and somehow generated and exists in the preceding "providing, during the periodic couplings" limitations, even though the claim itself fails to recite a "down-converted signal" in those limitations. Then, when "a down-converted signal" is first recited in conjunction with "forms," ParkerVision argues that "forms" means merely "shaping" a pre-existing (but never before referenced) down-converted signal.

> 1. A method for down-converting an electromagnetic signal, comprising:
>   periodically coupling an electromagnetic signal that includes a carrier signal to an energy storage device and a load, wherein the periodic couplings occur at a rate less than twice the frequency of the carrier signal;
>   providing, during the periodic couplings, energy from the electromagnetic signal to the energy storage device, thereby changing an amount of energy stored by the energy storage device;
>   providing, during the periodic couplings, energy from the electromagnetic signal to the load; and
>   providing, between the periodic couplings, energy from the energy storage device to the load, thereby changing the amount of energy stored by the energy storage device;
>   whereby the energy provided to the load forms a down-converted signal.

ParkerVision argues this energy is already a down-converted signal despite no reference to it as such

Appx409-410 ('907 patent, claim 1 (annotated)); *see* BlueBr12 (arguing the '907 patent describes filtering the already down-converted signal to "form[] a smooth waveform shape"); BlueBr22 (noting its expert Dr. Allen's summary judgment testimony that "[t]he load doesn't down-convert anything," but "just shape[s] the

down-converted signal provided to it from the switch and the energy storage device").

ParkerVision's interpretation is "convoluted and artificial" and ignores the context in which the term is used. *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed. Cir. 2001) (claims should be interpreted "from the perspective of one of ordinary skill in the art, . . . not from the viewpoint of counsel or expert witnesses retained to offer creative arguments in . . . litigation"). The straightforward interpretation of the term, when considered in the context of the full claim, is that when the down-converted signal is recited for the first time as being "formed" in the last limitation, that means the signal is being generated. A "down-converted signal" is not recited in the claim at *any* point prior to the recitation of energy being provided to the load; instead, the claims merely refer to "energy" from the "electromagnetic signal" being provided to and from the energy storage device, thereby changing the amount of energy stored by the energy storage device. Nowhere in the claim language does claim 1 suggest, much less specify, that this repeatedly invoked "energy" is already a down-converted signal. Appx409-410.

ParkerVision argues that the Court should treat the final "whereby" clause of claim 1 as merely "describ[ing] the *result* of the preceding method steps." BlueBr48 (emphasis in original). But even if it were appropriate to do so, it does not alter the analysis. Rather, it confirms that the "result" of providing energy to the load from

the energy storage device, as described in the preceding method step, is the formation, *i.e.*, generation, of the down-converted signal. In other words, the down-converted signal is generated using stored energy.

*Second*, the specification supports the district court's construction. "Forms" is not discussed in the '907 patent's specification in conjunction with "shape" or "smooth," or in any manner that is synonymous with those terms. Instead, where "forms" is discussed in the relevant context in the specification, it is used in a way that is synonymous with "generates."

For example, the specification describes Figure 83D as the signal that is output by the "energy transfer" structure in Figures 82A and 82B. *See* Appx379 (69:4-5, 21-23).



Appx265 (Fig. 83D). The specification explains that "FIG. 83D illustrates a down-converted signal 8310 that *is formed by* energy transferred from the input EM signal 8302." Appx379 (69:21-23). The specification further explains in reference to FIG. 65 that "FIG. 83D illustrates the transferred energy stored in the storage module 6506. *The storage module 6506 outputs the transferred energy as the down-converted signal* 1308B." Appx394 (100:4-7).



FIG. 65

Appx240 (Fig. 65); *see also* Appx394 (99:43-49). Thus, in reference to the "energy transfer" structure in Figures 82A and 82B, the '907 patent's specification uses the term "forms" as synonymous with "generates" to describe "generating" a down-converted signal using energy transferred from a storage module.

ParkerVision itself has previously agreed with this reading of the specification. Before this Court in *ParkerVision I*, ParkerVision relied on the identical "energy transfer" structure in Figure 82A of the '551 patent (which, again, is incorporated by reference into the '907 patent and identical to Figure 82A in the '907 patent, *see supra* n.2). There, ParkerVision described generating a down-converted signal using transferred energy from a storage device. *See, e.g.*, Corrected Nonconfidential Brief of Plaintiff-Appellant ParkerVision, Inc. at 17, *ParkerVision*

33

*I*, 621 F. App'x 1009 (Nos. 2014-1612, 2014-1655) (explaining with reference to Fig. 82A that "[w]hen the switch is opened, a significant portion of the energy accumulated in the capacitors discharges into the load circuitry (8212) and is output as a down-converted signal, *i.e.*, a baseband signal."). If, as ParkerVision previously represented to this Court, Figure 82A describes "generating" a down-converted signal using energy stored in a capacitor, ParkerVision's current argument necessarily fails: the signal *cannot* already be down-converted (from the periodic couplings) and thereafter merely shaped.

ParkerVision includes a string cite to the specification for the contention that the '907 patent "repeatedly describe[es] 'forming' a continuous signal from down-converted samples." BlueBr47-48. ParkerVision appears to have cited every sentence that uses the word "form" as a verb. But none discusses the term in the context that it is used in claim 1, "whereby the energy provided to the load forms a down-converted signal." Rather, most are variations of the same disclosure that "voltage points form" a signal. *See* Appx361 (33:49–50, 34:49–50); Appx362 (36:13–14); Appx363 (37:12–13, 38:39–40); Appx364 (39:35–36); Appx366 (43:43–45, 44:49–50); Appx367 (46:21–22); Appx368 (47:25–26); Appx370 (52:29–30), Appx371 (54:2–3). These disclosures make no mention of energy provided to a load forming a down-converted signal. Moreover, at the end of each cited paragraph, the specification teaches that the already generated signal can later

34

be "smoothed or filtered if desired," *see, e.g.,* Appx361 (33:53-55), further underscoring that "form" means something other than "shape" or "smooth" as ParkerVision suggests. As to the rest of ParkerVision's citations, they actually use "forms" in a manner synonymous with "generates" and provide additional support for the district court's construction. *See* Appx379 (69:21–23) ("Fig. 83D illustrates a down-converted signal 8310 that is *formed* by energy transferred from the input EM signal 8302."); Appx380 (71:19–22) ("[T]he transferred energy 4706 *forms* an AM intermediate signal . . . ."); Appx396 (104:38–39) ("The charge stored by capacitor 11010 during successive samples *forms* down-converted signal 11012."); Appx397 (106:4–6) ("The charge stored by capacitor 11230 during successive samples *forms* down-converted signal 11214.").

ParkerVision also attempts to refute the district court's construction that the down-converted signal is generated using energy provided to the load by instead contending that "down-converted signal portions from the input signal and capacitor combine in the load" to "form" the down-converted signal. BlueBr11-12, BlueBr49-50. This appears to be a reformulation of ParkerVision's "shapes" argument. *See* BlueBr40 (arguing the down-converted signal is not created after the switch, but rather "combine[d] or shape[d]"). But regardless, this reading of claim 1 finds no support in the record.

ParkerVision points to Figure 57E which illustrates the signal "generated by the down-conversion process" and includes portions "stored in a storage device." Appx388 (87:9-10, 87:24-26). ParkerVision contends that the "portions" of the signal shown in the figure that are transferred during "periodic couplings" and between "periodic couplings" are each already down-converted signals and are simply combined in the load to "form" a complete, continuous down-converted signal. BlueBr49-50. But, as the district court observed, nowhere in the claim language does claim 1 specify that the repeatedly invoked "energy" is already a down-converted signal. "That is, the claim language does not provide that a change in the amount of energy equates with a down-conversion of the signal." Appx16. ParkerVision does not cite *anything* in the specification for its ultimate contention that the "portions" are themselves already down-converted. ParkerVision's only intrinsic evidence citation is to the "whereby" limitation of claim 1. *See* BlueBr49-50 (citing Appx410 (131:13-14)). But the "whereby" limitation says nothing about portions of a signal being combined.

In sum, the intrinsic evidence uniformly supports the district court's construction.

**b.    Extrinsic evidence further confirms the district court's construction**

Although not needed given the clarity of the intrinsic evidence, the extrinsic evidence also supports the district court's construction. *See Seabed Geosolutions*

*(US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("[W]e . . . give primacy to intrinsic evidence, and we resort to extrinsic evidence to construe claims only if it is consistent with the intrinsic evidence."). Qualcomm's expert Dr. Razavi offered an opinion consistent with the district court's construction that the down-converted signal is generated using energy transferred to the load from the energy storage device. *See* Appx12678-12683. And ParkerVision's expert Dr. Allen testified during his deposition that he understood the claim in the same way:

> Q: And that would be true of the '907 claims as well, that they would require ***producing*** *the low frequency baseband signal using energy that has been transferred* from a high frequency carrier signal *into a storage medium*; correct?
>
> A: With the same stipulation that that's only part of the signal producing the down – a downconverted voltage.
>
> Q: But that's part of the requirement; correct?
>
> A: ***Yes, according to the patent***.

*See* Appx7235 (211:6-16); *see also ParkerVision II*, 116 F.4th at 1359 (noting that Dr. Allen testified that the receiver claims of the '907 patent "require that you produce a lower-frequency signal using energy that's been transferred from a higher-frequency signal into a storage medium."); *Phillips*, 415 F.3d at 1317 (authorizing reliance on expert testimony). In addition, Mr. Sorrells testified that energy transfer sampling (the purported invention that forms the basis of the '907 patent) involves generating the down-converted signal using energy stored in an

37

energy storage device. *See* Appx19054 (43:6-23); *Phillips*, 415 F.3d at 1317 (authorizing reliance on inventor testimony).

ParkerVision's proffered extrinsic evidence, in contrast, is both contradictory and inconsistent with the intrinsic evidence. *See Phillips*, 415 F.3d at 1318 ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history . . . ."). ParkerVision argues that its expert Dr. Allen refuted the district court's construction by showing that the four "periodic coupling" steps in claim 1 perform down-version at the switch. *See* BlueBr51. But a closer examination of Dr. Allen's summary judgment declaration reveals its fundamental flaw. Dr. Allen points to Figure 126A of the '907 patent in an attempt to show that the down-converted signal can be generated by the switch that exists "upstream" of the energy storage device. Appx3405-3406. This is the same figure to which ParkerVision now points on appeal to argue that a down-converted signal exists at the output of the switch before the capacitor. BlueBr50-51.

But Dr. Allen and ParkerVision omit the critical fact that Figure 126A shows a *voltage mode* embodiment of the claimed invention. *See* Appx349 (10:1-14); Appx313 (Fig. 126A) (showing voltage signals); Appx314 (Fig. 126E) (units in the graph are "mV," which stands for milliVolts, a voltage unit). As was extensively addressed in *ParkerVision I*, unlike a current signal which flows along a wire, a

voltage signal "is the same everywhere along an electric wire . . . ." 621 F. App'x at 1015. Accordingly, the capacitor, *i.e.*, the claimed energy storage device, in Figure 126A is not "downstream" of the switch—the capacitor is along the same wire or point 12644, and is consequently at "one and the same point" as the switch and directly generates the down-converted signal at that point. *Id.*

Indeed, the '907 specification makes clear that *even in (voltage-mode) Figure 126A*, generating the down-converted signal *still* requires energy from the energy storage device. For example, the '907 patent states that "Capacitor C1 is the storage element for the input signal being sampled by FETs 12602-12640" in Figure 126A (all directly connected to wire or point 12644). Appx400 (111:17-19). And "FIG. 126E illustrates a down-converted signal at point 12644 of FIG. 126A, which is generated by the down-conversion process" using the claimed energy storage device. Appx400, (111:31-33). In fact, "the down-conversion process" disclosed in Section 5 of the specification (where Figure 126A's embodiment is discussed) repeatedly confirms that the down-converted signal requires energy output from the energy storage device. *See* Appx394 (99:42-49 ("the storage module 6506 transfer[s] energy from the EM signal 1304 to down-convert it"), 100:5-10 ("The storage module 6506 outputs the transferred energy as the down-converted signal 1308B.")). Accordingly, even in an embodiment where the switch and capacitor are inverted—including the

embodiment upon which Dr. Allen and ParkerVision rely—generating the down-converted signal still requires energy from the energy storage device.

In short, the voltage-mode embodiment depicted in Figure 126A does not undercut the district court's claim construction. Rather, it is entirely consistent with the court's construction: it still requires energy from the energy storage device to generate the down-converted signal. The extrinsic evidence thus confirms that in the '907 patent, "whereby the energy provided to the load forms a down-converted signal" means "whereby the energy provided to the load generates a down-converted signal."

**2. Claim 24 of the '940 patent claims an apparatus with "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal"**

**a. Intrinsic evidence confirms the district court's construction**

As the district court correctly concluded, the intrinsic evidence compels the construction that "a storage device storing energy from said UFT module" means "a storage device storing energy from said UFT module and using that energy to generate a down-converted signal" in the '940 patent, claim 24. Appx26. The dispute with this term, as the district court noted, "is whether the claimed storage device ('UFT module') uses stored energy to generate a down-converted signal, or, as ParkerVision claims, the storage device merely stores energy from the UFT module,

40

without any requirement that the stored energy be used for any purpose."[5] Appx24. The intrinsic evidence shows that the former meaning is correct.

Claim 24 recites a specific approach for down-converting a signal. Using a "Universal Frequency Translation (UFT) module," the claim requires first "aliasing" the signal and then "transferring energy" from the signal to a "storage device." Appx135 (69:54-67). The '940 patent specification expressly states that this particular claimed technique of down-converting a signal uses the energy stored in the storage device to generate the down-converted signal.

In the section titled "6.3 Summary Description of Down-conversion Using a Universal Frequency Translation Module," the specification teaches that a stored charge is used to generate a down-converted signal. *See* Appx129 (57:27-28, 58:9-19). In particular, the specification explicitly states: "[t]he train of pulses 6418 as

---

[5] ParkerVision latches on to the district court's suggestion that the storage device is the "UFT module" to claim that the court misunderstood claim 24. BlueBr27, BlueBr27n.2, BlueBr30, BlueBr33, BlueBr37, BlueBr56. But it is clear from the court's order that this lone reference to "UFT module" was scrivener's error and not a substantive shortcoming. For example, just two sentences later, the court explains that "Qualcomm avers that the intrinsic and extrinsic records refute ParkerVision's contention that *the claimed storage device merely stores energy from the UFT module* without requiring the stored energy to be used for a specified purpose." Appx24. This sentence would not make sense if the court believed the UFT module *was* the claimed storage device. And on the next page, the court again describes Qualcomm's argument in a manner that demonstrates that the court understands the UFT module and the storage device are different: "Thus, Qualcomm argues, the claimed storage device does not merely store energy from the UFT module; rather, the stored energy is used to generate the down-converted signal." Appx25.

shown in FIG. 64D controls the switch 6408 to alias the input signal 6404 with the control signal 6406 to generate a down-converted output signal 6412. More specifically, . . . [*t*]*he charge stored during successive pulses forms down-converted output signal 6412.*" Appx129 (58:9-19).



FIG. 64A

Appx99 (FIG 64A-1). This makes clear that the claimed storage device does not merely store energy from the UFT module, but the stored energy is in fact used to generate the down-converted signal.

In short, the specification consistently describes how both the UFT module 6402 and the storage device 6410 are used to create the "down-converted output signal 6412," which only exists at a point shared by both the output of the UFT module and the "Capacitor 6410". Appx129 (58:9-19); Appx99 (Fig. 64A, Fig. 64A-

42

1). There is no description or support for an embodiment in which the UFT module 6402 creates a down-converted signal without the contribution of the energy storage device. There is no figure showing a down-converted signal appearing at the output of a UFT module without a shared connection with a storage device. To the contrary, the specification makes clear that *both* the UFT and the capacitor are required "to down-convert" to a baseband signal.

Ignoring the specification's clear teachings about the role of stored energy in down-conversion, ParkerVision tries to rewrite claim 24 by arguing that "the claim explicitly assigns down-converting to the UFT module." BlueBr35. But the claim does *not* recite a UFT module that down-converts. Instead, it recites a UFT module that aliases the electromagnetic signal, according to an aliasing signal, at an aliasing rate "to down-convert an electromagnetic signal" and then transfer energy at that same aliasing rate to a storage device. Appx135 (69:54-67). Consistent with the specification, the claim recites that the aliasing rate is what is important "to down-convert said electromagnetic signal," *id.*—the aliasing rate needs to be such that the energy sampling configuration ultimately down-converts the electromagnetic signal by transferring and storing energy in the storage device. Appx129 (58:1-19).

ParkerVision's reliance on the claim's recitation of "to down-convert" in connection with the UFT module is thus a red herring. Read in context, the specification clearly indicates that the "to down-convert" language in claim 24 states

43

a goal, or objective, of which the UFT is a part—not the result of the UFT module operating in isolation, as ParkerVision argues. If a person says they washed cabbage "to make coleslaw," that does not mean that *just* washing cabbage made coleslaw. Rather, washing cabbage was part of a process—and when combined with other parts of that process—it results in the ultimate goal of making coleslaw. So too here.

Furthermore, claim 24 recites more than just a UFT module. It also claims the transfer and storage of energy in an energy storage device. Contrary to ParkerVision's argument that the district court's construction "reads inexplicable redundancy into the claim," BlueBr37, if the switch of the UFT module *by itself* down-converts the electromagnetic signal, as ParkerVision asserts, the other claim elements would be superfluous. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

The intrinsic evidence therefore confirms the district court's construction.

### b. Extrinsic evidence further confirms the district court's construction

There is also extensive extrinsic evidence supporting the district court's construction.[6] *First*, the '940 patent's inventors repeatedly confirmed that their

---

[6] As ParkerVision acknowledges, this Court reviews "any findings of fact regarding extrinsic evidence for clear error." *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC,* 57 F.4th 1001, 1008 (Fed. Cir. 2023); Appx19, Appx21 (findings below).

alleged invention relates to using energy stored in the storage device to generate the down-converted signal. For example, when inventor Michael Bultman was asked whether the down-converted signal is "generated" from the discharge of the energy storage device, such as a capacitor, he replied: "That's right. Yeah, the energy is taken from [the capacitor]." Appx7286 (199:9-200:16). Similarly, inventor Robert Cook confirmed that "the downconverted signal was generated from the capacitor." Appx4637-4638 (178:19-179:4). As this Court has cautioned, ParkerVision is not entitled to a construction that is broader than what the inventors invented. *MySpace v. GraphOn*, 672 F.3d 1250, 1256 (Fed. Cir. 2012) ("An inventor is entitled to claim in a patent what he has invented, but no more. . . . Therefore, in construing a claim there are two limiting factors—what was invented, and what exactly was claimed.").

*Second*, all the technical experts in the case understand claim 24 to work in a way that is consistent with the district court's construction. Qualcomm's expert Dr. Razavi offered an opinion consistent with the district court's construction that energy from the energy storage device is used to generate a down-converted signal. *See* Appx12695-12699. And both of ParkerVision's experts, Dr. Allen and Dr. Steer, "testified in deposition that the receiver claims of the . . . '940 patent[] 'require that you produce a lower-frequency signal using energy that's been transferred from a higher-frequency signal into a storage medium.'" *ParkerVision II*, 116 F.4th at 1359.

Dr. Allen testified that the energy stored in the energy storage device "is used to create a downconverted voltage signal." Appx7237 (218:12-20). He then further confirmed this understanding of claim 24:

> Q: Right. I guess what I'm trying to get at is: Do you believe the '940 patents [sic] require at least producing the low frequency baseband signal using energy that has been transferred from a high frequency carrier signal into a storage medium?
>
> A: Yes.

*See* Appx7237 (219:20-25). Dr. Allen expressed the same understanding again when offering invalidity opinions. *See* Appx5908 (¶¶ 231-32) (distinguishing prior art on grounds that unlike claim 24 of the '940 patent, the prior art "does not teach or suggest the transfer of energy from a carrier signal *to a storage device* and the use of *that energy to generate* a lower frequency or the baseband"). Likewise, when ParkerVision's substitute expert Dr. Steer was asked whether claim 24 requires "that you produce a lower-frequency signal using energy that's been transferred from a higher-frequency signal into a storage medium," he confirmed: "Yes, it does." Appx7379 (74:18-24).

Thus, the extrinsic evidence further supports the district court's construction.

## C. ParkerVision's arguments ignore the clear dispute over claim scope, rely on new claim constructions ParkerVision failed to raise below, and mischaracterize the issues on appeal

Rather than engage in earnest with the district court's claim constructions and the extensive evidence that supports them, ParkerVision attempts to argue that there

is not actually a dispute over claim scope requiring resolution. It does so by introducing new claim construction arguments never raised below and mischaracterizing the issues on appeal. The Court should reject ParkerVision's efforts to deflect.

1. **The parties have an actual dispute over claim scope that requires construction**

As this Court has recognized, the parties have "competing positions" regarding the meaning and scope of claim 1 in the '907 patent and claim 24 in the '940 patent. *ParkerVision II*, 116 F.4th at 1360. Consequently, this Court concluded that the district court needed to "undertake any necessary claim construction and then determine whether the receiver claims asserted in this case have the same requirement as the generating limitation of the claims . . . in *ParkerVision I*." *Id.* That is exactly what the district court did. Now, because ParkerVision does not like the outcome, it asks this Court to erase the district court's constructions and assign the jury the duty of ascertaining the "plain and ordinary" meaning of the disputed terms. ParkerVision's approach is contrary to this Court's precedent.

The Court has explained that district courts have an obligation "to ensure that questions of the scope of the patent claims are not left to the jury. . . .  [T]o fulfill this obligation, the court must see to it that disputes concerning [claim] scope . . . are fully resolved." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009). Accordingly, if "the 'ordinary' meaning of a term does not resolve

the parties' dispute . . . claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit." *O2 Micro*, 521 F.3d at 1361; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (holding it was "legal error" to leave the "question of claim scope unanswered" and "for the jury to decide").

ParkerVision cherry-picks certain of this Court's remarks to argue that it has already decided the claim construction issues that are the subject of this appeal. *See, e.g.*, BlueBr2. ParkerVision is wrong. Although this Court offered some observations regarding possible claim interpretations in *ParkerVision II*, it explicitly declined to engage in claim construction. The Court stated that "[w]hile claim construction is ultimately a question of law, in this appeal we are not well-positioned to undertake claim construction in the first instance." 116 F.4th at 1360. The Court also expressly noted that "extrinsic evidence, including the testimony of the parties' competing experts, may need to be considered" to construe the claim scope, which the Court explained was a job for the district court. *Id.* In short, this Court entrusted claim construction to the district court—a duty that the district court then faithfully discharged.

Relatedly, ParkerVision argues that the district court's claim constructions are improper because "neither the district court nor Qualcomm identified lexicography or disavowal that could overcome" the supposed "plain language" of the disputed

claim terms. BlueBr30, *see also* BlueBr29. But the "ordinary meaning of a claim term is not the meaning of the term in the abstract," as ParkerVision suggests. *Eon Corp.*, 815 F.3d at1320. "Instead, 'the ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent.'" *Id*. (quoting *Phillips*, 415 F.3d at 1321); *see Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent."). "A party . . . is not entitled to a claim construction divorced from the context of the written description . . . ." *Eon Corp.*, 815 F.3d at 1320. Adoption of ParkerVision's position that, absent a showing of explicit lexicography or disavowal of claim scope by the patentee, the district court erred in construing the claims at all would mean that the district courts are free—and indeed required—to forgo claim construction and cast many more cases to juries with nothing more than a "plain and ordinary meaning" instruction, even when it is evident that there are genuine disputes about the meaning of claim terms. This is not the law. *O2 Micro*, 521 F.3d at 1361; *Trs. of Columbia Univ.*, 811 F.3d at 1363 ("Our case law does not require explicit redefinition or disavowal.").[7]

---

[7] The cases ParkerVision cites for its "disavowal" argument, BlueBr32-33, BlueBr49, actually *support* the constructions below. In *Straight Path IP Grp. Inc. v. Sipnet EU S.R.O.*, the "claim language" left "no genuine uncertainties on interpretive questions"; hence the specification played a "more limited role than in the common situation"—like here—"where claim terms are uncertain . . . ." 806 F.3d 1356, 1360-61 (Fed. Cir. 2015). In *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, the court read the claim "in the context of the specification" and found that the prosecution history

The district court's constructions thus were required under binding authority, are well reasoned and correct, and should not now be disturbed. Consistent with *Phillips*, the district court reviewed claim language in light of the specification, as well as the supporting extrinsic evidence, and construed the disputed claim terms based on the overall context of the patent. And as discussed *supra*, the intrinsic (and extrinsic) record overwhelmingly supports the district court's constructions.

### 2. ParkerVision implicitly—and improperly—argues for alternative constructions of two *new* terms

In a tacit admission that there *is* a dispute over claim scope, ParkerVision devotes much of its brief to arguing about the meaning of two different terms for which it has never sought construction: "UFT module" ('940 patent) and "periodic coupling" ('907 patent). According to ParkerVision, proper construction of these terms forecloses Qualcomm's proposed constructions of the "forms" and "storage device" limitations. *See, e.g.*, BlueBr1, BlueBr7. Specifically, ParkerVision argues the '907 patent recites "periodically closing ('coupling') a switch to sample the signal's energy and transfer the down-converted samples to a capacitor and a load," while the '940 patent recites using a "'UFT module'—a switch—to down-convert a signal." BlueBr7. Although ParkerVision never acknowledges that these are new

---

did not disavow the claims' full scope. 902 F.3d 1372, 1377-80 (Fed. Cir. 2018). And *Grace Instrument* reiterated that "a claim term" is read "in the context of the entire patent, including the specification," and that where the specification instructs on terms, "the inventor's lexicography governs." 57 F.4th at 1008, 1010.

proposed constructions, that is exactly what they are: ParkerVision proposes interpretations of claim terms for which there are no accepted plain and ordinary meanings and then argues, just as a party proposing a claim construction does, that its interpretations are supported by the intrinsic and extrinsic evidence. *See, e.g.*, BlueBr7 ("The intrinsic and extrinsic records confirm that the ['UFT module'] down-converts the signal"); *id.* ("The intrinsic and extrinsic records confirm that the transferred energy is down-converted after the switch" that is periodically closed); *see also* BlueBr29 (claims and specification "explicitly credit[] the UFT module (switch) with down-converting"); BlueBr30 ("the recited 'periodic coupling' steps down-convert the signal at the switch"); BlueBr35 ("UFT module . . . down-converts"); BlueBr46 ("charge . . . [is] down-converted by opening and closing ('periodically coupling') the switch").

ParkerVision's *de facto* constructions of the "UFT module" and "periodic coupling" terms and its arguments that "[t]he intrinsic and extrinsic records confirm" its constructions, BlueBr7, were never presented in the district court. Indeed, ParkerVision argued against any further constructions, Appx18992 ("no new claim construction of *any term* is warranted"), and instead used its claim construction brief to provide its own interpretation of *ParkerVision II* and rehash arguments in opposition to Qualcomm's prior collateral estoppel summary judgment motion. *See* Appx18989-19010; *see also* Appx10-11. The district court thus never had an

opportunity to address ParkerVision's *de facto* constructions for the "UFT module" and "periodic coupling" terms.

Having failed to argue for any construction of "UFT module" and "periodic coupling" before the district court, ParkerVision cannot now do so for the first time on appeal. As this Court has repeatedly explained, "[l]egal issues in patent infringement suits are not immune to the doctrine of waiver on appeal, and except for certain circumstances, those issues not raised below at the district court cannot be heard for the first time on appeal. Thus, a party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006).

ParkerVision is not merely "clarifying or defending the original scope of its claim construction," *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001), or "supporting its original claim constructions with the new citations to intrinsic evidence." *Seabed Geosolutions*, 8 F.4th at 1289. Rather, ParkerVision is advancing new proposed constructions, arguments, and evidence that were never presented to the district court. That is improper. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal[.]").

The Court should reject ParkerVision's attempt to introduce claim constructions for the first time on appeal. But even if considered, ParkerVision's new arguments conflict with the intrinsic and extrinsic evidence and should be rejected for the same reasons the district court's claim constructions should be affirmed.

### 3. ParkerVision mischaracterizes the claim construction issue on appeal

Related to its improper arguments for constructions of new terms, ParkerVision characterizes the claim construction inquiry as whether the down-converted signal is generated "at or after" the storage device. *See, e.g.*, BlueBr1-2, BlueBr7, BlueBr32. This is a straw-man argument. The issue before the Court, as it was before the district court, is whether the down-converted signal is generated using energy from the storage device. Qualcomm never argued—and the district court never held—that down-conversion must occur "at or after" the claimed storage device, or at any location.

ParkerVision's basis for its "at or after" framing is a mischaracterization of *ParkerVision I*. ParkerVision contends this Court held that the asserted claims at issue in that case "require generating the down-converted signal for the first time at or after a capacitor." BlueBr17. Not so. The issue on appeal in *ParkerVision I* was whether Qualcomm's products *infringed* the asserted claims—claim construction was not at issue and neither this Court nor the district court construed any terms, as

ParkerVision suggests, to require generation of the down-converted signal at or after a capacitor. *See ParkerVision I*, 621 F. App'x at 1012-16. Indeed, there was no dispute that the claims required that the signal be generated "using energy that has been transferred from a high-frequency carrier signal into a storage medium, such as a capacitor or set of capacitors." *Id.* at 1013. For purposes of Qualcomm's current-mode products, the *ParkerVision I* court found that generating the down-converted signal using stored energy would require "electric current . . . to go in and out of the storage capacitors in order to create the [down-converted signal]." *Id.* at 1016. But this *noninfringement* finding, specific to Qualcomm's current-mode products, in no way *construed the claims* to generally include such a limitation.

Relatedly, ParkerVision argues that the district court's constructions make "nonsense" of the claims—and render the claimed invention inoperable—by requiring that the signal be generated "at or after" the storage device. BlueBr39-40, BlueBr52. But the district court did *not* construe the terms to have such a requirement. And regardless, the patents disclose the very thing that ParkerVision contends is inoperable: embodiments where the switch that ParkerVision contends generates the down-converted signal is in fact "after" the storage device, as well as voltage-mode embodiments where the placement of the energy storage at or after the switch has no impact on whether energy from the device may be used. *See* Appx212 (Fig., 42); Appx374 (59:64-60:16); Appx252 (Fig. 74); Appx396 (103:40-61);

54

Appx254-257 (Figs. 76A-E); Appx402-403 (115:52-118:7); Appx349 (10:1-14); Appx313 (Fig. 126A); Appx314 (Fig. 126E); *ParkerVision I*, 621 F. App'x at 1015-16 (discussing voltage mode).

The actual issue before this Court is made clear by a plain reading of the disputed claim limitations and the constructions adopted by the district court. Neither limitation, nor the district court's constructions, say anything about the *location* where down-conversion must occur. Instead, they concern, in the case of the '907 patent, whether "the energy provided to the load generates a down-converted signal," and in the case of the '940 patent, whether energy from the storage device is "us[ed]" "to generate a down-converted signal." *See* Appx15 ("Qualcomm correctly frames the issue . . . as follows: '[t]he parties dispute whether the energy provided to the load generates a down-converted signal or whether the energy provided to the load shapes an already existing down-converted signal.'"); Appx24 ("Qualcomm submits, correctly, that the issue is whether the claimed storage device ('UFT module')[8] uses stored energy to generate a down-converted signal, or, as ParkerVision claims, the storage device merely stores energy from the UFT module, without any requirement that the stored energy be used for any purpose."). This Court should reject ParkerVision's straw-man attempt to reframe the dispute.

---

[8] *See supra* n.5 regarding the district court's lone scrivener's error.

*     *     *

In sum, ParkerVision offers no grounds to disturb the district court's constructions, which are dictated by the intrinsic evidence and further supported by the extrinsic evidence.

## D.     ParkerVision's extraordinary request for judicial reassignment is baseless

ParkerVision provides no basis for this Court to invoke the "severe remedy" of judicial reassignment—a measure reserved only for "conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1206 (11th Cir. 2025). Where, as here, there is "no indication of actual bias," the Eleventh Circuit applies a three factor test: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989).[9] No factor supports reassignment here.

---

[9] ParkerVision inherently concedes that there is no indication of actual bias by applying the *Torkington* factors. BlueBr54-55.

*First,* there is no indication that the district judge would have difficulty reconsidering previous orders. In *ParkerVision II*, this Court held the district court erred by not performing claim construction. 116 F.4th at 1360. On remand, the district court followed the Court's instructions: it ordered additional claim construction briefing and issued a comprehensive 22-page order analyzing the evidence in accordance with *Phillips. See* Appx7-28. ParkerVision's assertion that the district judge "defied this Court's command" is wrong. BlueBr55-56. Even if the district court erred in its claim constructions (it did not), "opinions based on a faulty legal premise" do not demonstrate an inability to consider the evidence anew on remand. *CSX Transp., Inc. v. State Bd. of Equalization*, 521 F.3d 1300, 1301 (11th Cir. 2008). Indeed, the Eleventh Circuit has declined to order reassignment even where the district court has been reversed twice on the same issue. *See Sovereign Mil. Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers* ("*SMOM IV*")*, 809 F.3d 1171, 1194 (11th Cir. 2015).

ParkerVision also argues that the district court has "derided both this case and this Court," pointing to a handful of comments by the court concerning the case management implications of *ParkerVision II*. BlueBr56. None comes close to meeting the high bar for reassignment. For example, the court commented offhand that it had "already expended more time and resources on this one case than is

justifiable." *Id.* (quoting Appx5). Although ParkerVision argues this was derisive, the court was simply acknowledging the extensive resources this case has required— and explaining that "[t]he Federal Circuit is now intimately familiar with this case and is well-positioned to promptly review the Court's construction of claims that it identified." Appx5. That was not derision—it was the court's analysis of judicial efficiency, one of its reasons for granting ParkerVision's Rule 54(b) motion. And even if the district court's comments could be interpreted as expressing dissatisfaction with this Court, "expressions of impatience, dissatisfaction, annoyance, and even anger," *Liteky v. United States*, 510 U.S. 540, 555-56 (1994), or statements expressing a "legitimate and justified desire for an aged case to be resolved," *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 133 F.4th 1238, 1255 (11th Cir. 2025), do not establish bias or partiality warranting disqualification.

ParkerVision's cited authorities only underscore the differences between this case and the rare circumstances that warrant reassignment. BlueBr57. In those cases, reassignment followed blatant disregard for the law or "direct defiance" of an appellate mandate. *SMOM IV*, 809 F.3d at 1193 (collecting cases granting reassignment where courts exhibited "direct defiance" or a "stalemated posture," including "stubbornly persist[ing]" in a decision without reasonable justification, or entering a decision that had been *explicitly* reversed by the appeals court); *see Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (reassigning after *third*

reversal where judge failed to comply with appellate mandate); *United States v. Martin*, 455 F.3d 1227, 1242 (11th Cir. 2006) (reassigning where judge was reversed for multiple "extraordinary" and baseless departures from Sentencing Guidelines); *Torkington*, 874 F.2d at 1447 (reassigning where judge dismissed case at first opportunity, stated that "this prosecution was 'silly,' and . . . a waste of the taxpayers' money" and "questioned the wisdom of the substantive law"); *Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1253 (Fed. Cir. 2008) (applying Ninth Circuit law to reassign where judge refused to apply the correct legal framework for inequitable conduct). That is not the case here. The district court has presided over this decade-long patent case by issuing thorough orders with careful reasoning. Any frustration with protracted litigation falls far short of the demanding standard for reassignment.

*Second,* this is not a case where reassignment is necessary to preserve the appearance of justice. ParkerVision claims that the court remarked "that a jury cannot understand this case and that it should not be tried to a jury at all." BlueBr58-59. But the court was merely commenting on the complexity of the technical record. Appx18317-18318 (41:24-42:8). That idea—that patent cases can be challenging for juries—has been shared by many jurists. It does not indicate bias. ParkerVision also argues that the court "threatened to undermine ParkerVision's trial right by depriving ParkerVision of key evidence." BlueBr59. But ParkerVision profoundly

mischaracterizes the record. ParkerVision originally asked to substitute its expert, Dr. Steer—which would likely require reopening discovery, *Daubert* motions, and dispositive motion practice—because he had retired. *See* Appx19159, Appx19163-19166. On reconsideration, ParkerVision argued for the first time that Dr. Steer had a cancer diagnosis but provided no evidence that he would be unable to appear at trial. *See* Appx19138-19142.[10] As a result, the district court declined to grant ParkerVision's motion to substitute based on a lack of information.[11] Appx19141.

The district court's statements regarding judicial resources and expert substitution do not suggest prejudgment or a determination to end the case by a specific date—in sharp contrast to the case ParkerVision cites. *See* BlueBr58 (citing *Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1351 (Fed. Cir. 2025)). Moreover, the court has decided significant disputes in ParkerVision's

---

[10] ParkerVision selectively quotes (and thus egregiously misrepresents) the district court as suggesting that videos of Dr. Steer's deposition "should suffice" because "[s]ometimes they die." BlueBr59. But the court was making a general observation about expert availability **before** disclosure of any cancer diagnosis. *See* Appx18792. This observation about litigation realities does not support reassignment.

[11] Qualcomm opposed ParkerVision's motion to substitute given the lack of required information and the prejudice to Qualcomm, Appx18950-18984; Qualcomm was sorry to learn of Dr. Steer's diagnosis and was sorrier still to hear about Stage IV cancer—which ParkerVision mentioned for the first time in this appeal, *see* Appx18908, Appx19286-19294.

favor. For example, it granted ParkerVision's Rule 54(b) motion to facilitate this very appeal.

ParkerVision has made a habit of crying bias, or worse, whenever the district court rules against it. A little more than a year ago ParkerVision launched a media campaign in which its founder baselessly accused the district judge who presided over *ParkerVision I* of political collusion and misconduct. Appx19280-19281. "For example," as the district court explained, "ParkerVision's CEO, Jeff Parker, claimed that the Obama Administration, acting through then Attorney General Eric Holder, somehow convinced the federal judge who presided over the [*ParkerVision I*] trial . . . to reverse the jury's award in favor of ParkerVision." Appx19281. Citing multiple ParkerVision videos and media interviews, Qualcomm moved for a temporary restraining order, arguing that ParkerVision was jeopardizing a fair trial by swaying the jury pool through a widespread disinformation campaign. *See* Appx19169-19193; *see also* Appx19197-19279. Although the court found ParkerVision's statements "littered with spin, half-truths, and outright lies," it nevertheless denied Qualcomm's motion and did not seek to punish ParkerVision for its "distasteful" media campaign. Appx19283. The court's rulings belie any suggestion of entrenched bias or partiality.

*Third,* reassignment would entail disproportionate waste and duplication. The district court here has managed this case for over a decade, issuing three claim

construction orders, ruling on numerous motions, and developing familiarity with highly technical subject matter. ParkerVision relies on *United States v. Gupta*, BlueBr60, where the court found reassignment would not produce excessive duplication because appellate "opinions . . . provide[d] much of the essential information." 572 F.3d 878, 892 (11th Cir. 2009). But "[t]his appeal is not a simple case with which a different judge could quickly become familiar." *CSX Transp., Inc.*, 521 F.3d at 1301. This Court's opinions, while helpful on discrete legal issues, do not substitute for the district court's familiarity with the asserted claims, the relevant wireless communication technology, and Qualcomm's products.

In sum, all three *Torkington* factors support maintaining the current judicial assignment.

## CONCLUSION

The Court should dismiss ParkerVision's appeal for lack of jurisdiction. If the Court reaches the merits, it should affirm the district court's claim constructions and partial summary judgment of noninfringement. Finally, the Court should deny ParkerVision's request to reassign the case.

Respectfully submitted,

Dated: March 16, 2026

*/s/ Robert A. Van Nest*
ROBERT A. VAN NEST
MATTHEW M. WERDEGAR
SOPHIE HOOD
ANJALI SRINIVASAN
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
Rvannest@keker.com
Mwerdegar@keker.com
Shood@keker.com
Asrinivasan@keker.com

MATTHEW BRIGHAM
DENA CHEN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 843-7400
Dchen@cooley.com
Mbrigham@cooley.com

EAMONN GARDNER
COOLEY LLP
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Telephone: (720) 566-4000
Facsimile: (720) 566-4099
Egardner@cooley.com

*Attorneys for Defendants-Appellees*
*QUALCOMM INCORPORATED,*
*QUALCOMM ATHEROS, INC.*

# CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets the following:

The filing has been prepared using Microsoft Word, with a proportionally-spaced typeface in 14-point Times New Roman font, and includes 13,889 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b). The word count includes the words counted by the Microsoft Word function.

This filing also complies with the typeface and type style requirements of Federal Circuit Rule 32(b).

*/s/ Robert A. Van Nest*
Robert A. Van Nest

# CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert A. Van Nest
ROBERT A. VAN NEST