Nos. 2026-1033, -1035

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PARKERVISION, INC.,
Plaintiff-Appellant,

v.

QUALCOMM INCORPORATED, QUALCOMM ATHEROS, INC.,
Defendants-Appellees.

Appeals from the United States District Court for the
Middle District of Florida, No. 6:14-cv-687-PGB-LHP

## PLAINTIFF-APPELLANT PARKERVISION, INC.'S REPLY BRIEF

Kevin Burgess
MCKOOL SMITH, P.C.
104 East Houston Street, Suite 300
Marshall, Texas 75670

Colin Hickl
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1200
Dallas, Texas 75201

Charles E. Fowler, Jr.
Joshua W. Budwin
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, Texas 78701
(512) 692-8722
cfowler@mckoolsmith.com

Counsel for Plaintiff-Appellant ParkerVision, Inc.

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES.........................................................................ii

INTRODUCTION .........................................................................................1

ARGUMENT ................................................................................................3

I.    This Court has jurisdiction. ........................................................3

    A.    The district court correctly rendered Rule 54(b) final judgment on the '940 and '907 receiver claims......................3

    B.    Two other grounds for jurisdiction exist.............................7

II.    This Court should reverse the district court's claim constructions reading in the *ParkerVision I* "generating" limitation. ........................................................................... 9

    A.    The district court read the *ParkerVision I* "generating" limitation into the claims, thus narrowing the claim scope to circuits that "generate" a down-converted signal "*at or after* the capacitor." .........................................10

    B.    Qualcomm concedes that no lexicography or disavowal supports narrowing the claim scope. ................................... 15

    C.    The district court erred by reading the *ParkerVision I* "generating" limitation into the '940 claims. ......................17

    D.    The district court erred by reading the *ParkerVision I* "generating" limitation into the '907 claims. ..................... 22

    E.    ParkerVision asks to construe no new terms........................25

III.    This Court should reassign this case. ..........................................26

CONCLUSION ...........................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

**Cases**

*Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*,
153 F. App'x 730 (Fed. Cir. 2005)................................................................6

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) .................................................. 15

*Aventis Pharms. Inc. v. Amino Chemicals Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) .................................................. 15

*Barrette Outdoor Living, Inc. v. Fortress Iron, LP*,
156 F.4th 1353 (Fed. Cir. 2025)................................................ 13

*Bergstrom v. Sears, Roebuck & Co.*,
599 F.2d 62 (8th Cir. 1979) .........................................................9

*Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) .....................................................4

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
446 U.S. 1 (1980) ........................................................................6

*Engel Indus., Inc. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999) ...................................................8

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ...........................................15, 16

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .................................................. 15

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
57 F.4th 1001 (Fed. Cir. 2023) ..................................................20

*Helifix Ltd. v. Blok-Lok, Ltd.*,
208 F.3d 1339 (Fed. Cir. 2000) ...................................................7

*In re Se. Banking Corp.*,
69 F.3d 1539 (11th Cir. 1995)......................................................4

ii

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021)..................................................................25

*Johnson v. Ocwen Loan Servicing, LLC*,
916 F.3d 505 (5th Cir. 2019)....................................................................3

*Liberty Mut. Ins. v. Wetzel*,
424 U.S. 737 (1976) .................................................................................9

*Micron Tech., Inc. v. Longhorn IP LLC*,
161 F.4th 1374 (Fed. Cir. 2025)..............................................................7

*Myco Indus., Inc. v. BlephEx, LLC*,
955 F.3d 1 (Fed. Cir. 2020) ...................................................................16

*ParkerVision, Inc. v. Qualcomm Inc.*,
116 F.4th 1345 (Fed. Cir. 2024)........................... 1, 10, 11, 13, 14, 16, 21, 24

*ParkerVision, Inc. v. Qualcomm Inc.*,
621 F. App'x 1009 (Fed. Cir. 2015)......................................................1, 11

*Planned Parenthood Sw. Ohio Region v. DeWine*,
696 F.3d 490 (6th Cir. 2012)....................................................................4

*Smithkline Beecham Corp. v. Apotex Corp.*,
No. Civ. A. 00-CV-1393, 2004 WL 634867 (E.D. Pa. Mar. 26,
2004) .......................................................................................................6

*Sound View Innovations, LLC v. Hulu, LLC*,
33 F.4th 1326 (Fed. Cir. 2022)......................................................... 23, 25

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ........................................................13, 17

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ........................................................15, 16

*TruePosition, Inc. v. Polaris Wireless, Inc.*,
No. CV 12-646-RGA-MPT, 2015 WL 887935 (D. Del. Mar. 3,
2015) .......................................................................................................6

*W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*,
  975 F.2d 858 (Fed. Cir. 1992) ......................................................3

**Statute**

28 U.S.C. § 1292(b) ................................................................ 8, 9

**Rule**

Fed. R. Civ. P. 54(b) ............................................ 3, 4, 5, 6, 7, 8, 9

**Other Authorities**

10 D. Coquillette, et al., Moore's Federal Practice § 54.22 (3d ed.) ...............4

10 D. Coquillette, et al., Moore's Federal Practice § 54.27 (3d ed.) ...............8

10 C. Wright & A. Miller, et al., Federal Practice & Procedure § 2657
  (4th ed.) ..................................................................... 3, 4

## INTRODUCTION

Qualcomm refuses to defend the claim constructions it obtained below. Since 2019, the parties have disputed whether the claims asserted here have the same "generating" limitation as the claims that disposed of noninfringement in *ParkerVision, Inc. v. Qualcomm Inc.*, 621 F. App'x 1009 (Fed. Cir. 2015) (*ParkerVision I*). In 2024, this Court reversed the district court's issue-preclusion ruling and remanded for claim construction to determine whether the claims here have the *ParkerVision I* "generating" limitation. *ParkerVision, Inc. v. Qualcomm Inc.*, 116 F.4th 1345, 1360 (Fed. Cir. 2024) (*ParkerVision II*). In its opinion, this Court carefully—and repeatedly—defined the *ParkerVision I* "generating" limitation as a requirement that down-conversion occur "*at or after* the capacitor" (storage device). *Id.* at 1351, 1353, 1357, 1358, 1359. On remand, Qualcomm asked the district court to read the *ParkerVision I* "generating" limitation into all the claims asserted here, and the court agreed. Since, under that construction, the claims here are the same as the *ParkerVision I* claims, ParkerVision agreed that issue preclusion applied and stipulated to noninfringement.

Qualcomm now insists that it has "never argued—and the district court never held—that down-conversion must occur 'at or after' the claimed storage device or at any other location." Red Br. 19; *see also id.* at 53, 54, 55. This revelation *disclaims* the position that Qualcomm pressed for *seven years* in asserting preclusion based on *ParkerVision I*. Given Qualcomm's disclaimer, the

1

district court's constructions reading in the *ParkerVision I* "generating" limitation—and the judgment of noninfringement—cannot stand.

Those constructions could not stand anyway. The claims here do not require down-converting at or after the capacitor. That notion defies the plain claim language and fundamental frequency-translation principles. The claimed receiver circuits down-convert "by aliasing the [input] EM signal" at the rate of a second, "aliasing" signal that drives a switch. Appx153 (abstract). The switch is the *only* component able to perform that aliasing, and the resulting frequency translation. The switch "samples" the input signal by periodically closing at the aliasing rate and transferring sampled energy portions containing the down-converted signal to a capacitor and a load. As the term "sampling" suggests, the circuit down-converts in *portions*. So while other circuit components play roles in forming a continuous, usable signal from these portions—piecing together successive down-converted portions and filtering the continuous signal—*the aliasing switch performs the down-conversion.*

Qualcomm never squarely disputes this understanding or offers a coherent alternative (though it summarily declares that it "disagrees with [ParkerVision's] inaccurate and disputed assertions" about the technology, Red Br. 8). Nothing but attorney argument—no intrinsic evidence or expert testimony—suggests that down-conversion can occur at or after the capacitor. At best, Qualcomm cites evidence recognizing that the capacitor, and energy stored in it, play roles in forming the down-converted signal. But Qualcomm cites nothing that supports reading in the *ParkerVision I* "generating" limitation.

**ARGUMENT**

## I.    This Court has jurisdiction.

The district court finally resolved all issues for ParkerVision's "receiver claims," a discrete set of claims involving different issues from the "transmitter claims." To avoid serial trials and promote a final resolution of this 12-year-old litigation, the district court exercised its discretion to let ParkerVision immediately appeal. This Court has jurisdiction.

### A.    The district court correctly rendered Rule 54(b) final judgment on the '940 and '907 receiver claims.

"Courts analyzing whether Rule 54(b) applies must focus on both [1] the finality of the judgment and [2] the separateness of the claims for relief." *W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Rsch. Assocs., Inc.*, 975 F.2d 858, 862 (Fed. Cir. 1992). Qualcomm's challenge turns on the "separateness" element. The '940 receiver and transmitter claims are separate "claims" under Rule 54(b), and so this Court has jurisdiction.[1]

**1.** No uniform test determines whether separate claims exist under Rule 54(b). *See Johnson v. Ocwen Loan Servicing, LLC*, 916 F.3d 505, 508 (5th Cir. 2019) ("Our caselaw, like that of other circuits, has not announced a single test for determining what is a 'claim' for Rule 54(b) purposes."); 10 C. Wright &

---

[1] Qualcomm purportedly disputes the "finality" element too. Red Br. 21–22. But there is no finality issue—the stipulated summary judgment of noninfringement finally resolved all issues for all receiver claims. Appx31; Appx19056. Qualcomm's "finality" argument is derivative of its "separateness" argument—it says judgment on the '940 patent is nonfinal because the *transmitter* claims are still pending. Red Br. 21. If Qualcomm is wrong on separateness—if the '940 receiver and transmitter claims are separate "claims" under Rule 54(b)—then it is wrong on finality too.

A. Miller, *et al.*, Federal Practice & Procedure § 2657 (4th ed.) (explaining that "[t]here is no generally accepted test").

Courts thus take a case-by-case, fact-specific approach to whether separate claims exist under Rule 54(b). Some look for distinct, separately recoverable damages. *See* 10 D. Coquillette, *et al.*, Moore's Federal Practice § 54.22 (3d ed.) ("If … separate recovery is possible, separate claims are presented under Rule 54(b)." (collecting cases)); *In re Se. Banking Corp.*, 69 F.3d 1539, 1547 (11th Cir. 1995) ("Claims are separable when there is more than one possible recovery or if different sorts of relief are sought." (cleaned up)). Some look for separately enforceable rights. *See, e.g.*, *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 500 (6th Cir. 2012). Still others take a less well-defined, "more pragmatic approach focusing on severability and efficient judicial administration." *See, e.g.*, *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

Under any approach, the '940 receiver and transmitter claims are separate "claims." Qualcomm does not contest that ParkerVision demands separate and additive—*i.e.*, separately recoverable—damages for the infringing receiver and transmitter functionality. ECF No. 16 at 4, 11, 14–16; Blue Br. 4. So ParkerVision will pursue both damages at trial and may recover both, either, or neither. The receiver and transmitter claims are also drawn to different technologies (transmitters and receivers), require different infringement proof, and give rise to distinctly enforceable rights since patent claims define separate and independent inventions. ECF No. 16 at 4, 11, 14–16; Blue Br. 4–

4

5. Finally, the parties, the district court, and this Court have pragmatically segregated the receiver from transmitter claims throughout this litigation because they involve distinct issues. *See* ECF No. 16 at 11–13. This appeal exemplifies that segregation: The claim-construction issue presented here is *dispositive* of the receiver claims yet *irrelevant* to the transmitter claims.

**2.** Qualcomm's challenge rests solely on a purported per se ban of Rule 54(b) judgments adjudicating fewer than all asserted claims of an asserted patent. Red Br. 20–25. Qualcomm's challenge fails because no such ban exists.

First, Qualcomm relies on claim-preclusion cases to argue that a "claim" under Rule 54(b) must encompass all claims of a patent. Red Br. 23–24 (citing *Senju* and *Hallco*). But ParkerVision explained that "claim" cannot mean the same thing in both the claim-preclusion and Rule 54(b) contexts, given the rule's plain language and Supreme Court precedent. Blue Br. 5 n.1. Qualcomm ignores that argument.

Second, the Rule 54(b) cases that Qualcomm cites establish no ban that would apply here. ECF No. 16 at 13–16. In *Houston Industries Inc. v. United States*, this Court held that Rule 54(b) judgment was improper when the appealed ruling resolved only part of a taxpayer's liability and damages for one tax year. 78 F.3d 564, 568 (Fed. Cir. 1996). Here, however, the judgment fully resolved liability and damages for the receiver claims—independently of any determination on the transmitter claims. Similarly, in *Donnelly Corp. v. Gentex Corp.* (nonprecedential), this Court held that Rule 54(b) judgment on some but not all asserted claims of a patent was improper when the claims on appeal

5

were "not sufficiently distinct" from the rest—all asserted claims were *held invalid for the same reason*. 95 F.3d 1168 (tbl.), 1996 WL 468452, at *3 (Fed. Cir. 1996). Here, the receiver and transmitter claims materially differ, and no common issue could dispose of both claim sets.

Qualcomm's district-court opinions are unpersuasive too. Red Br. 24–25 (citing *TruePosition, Inc. v. Polaris Wireless, Inc.*, No. CV 12-646-RGA-MPT, 2015 WL 887935 (D. Del. Mar. 3, 2015); *Smithkline Beecham Corp. v. Apotex Corp.*, No. Civ. A. 00-CV-1393, 2004 WL 634867 (E.D. Pa. Mar. 26, 2004)). Rule 54(b) judgment was improper in *Smithkline* because, unlike here, "the *plaintiff's recovery [would be] the same* no matter which theory of infringement" it proved. 2004 WL 634867, at *11 (emphasis added). And insofar as *TruePosition* applied a ban like Qualcomm urges, it misread an unpublished decision of this Court. 2015 WL 887935, at *3 n.49 (citing *Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*, 153 F. App'x 730, 731 (Fed. Cir. 2005)). *Aspex* had nothing to do with multiple patent claims; it concerned an infringement claim for which liability was decided, but "[d]etermination of damages, willfulness, and injunctive relief remain[ed] pending regarding the patent that was found to be infringed." 153 F. App'x at 731.

Third, Qualcomm's position ignores contrary precedent. It asks this Court to break from the fact-specific inquiry undertaken by every other circuit in determining when separate "claims" exist. It thus eliminates the flexibility that Rule 54(b) demands. *Cf. Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10–11 (1980) ("[B]ecause the number of possible situations is large, we are

reluctant either to fix or sanction narrow [Rule 54(b)] guidelines for the district courts to follow."). And it conflicts with patent law's claim-by-claim approach. *See* ECF No. 16 at 10–11 & nn.5–8.

Fourth, exercising jurisdiction here would not "open the floodgates to piecemeal appeals." Red Br. 25. Never has this Court faced a deluge of Rule 54(b) claim-construction appeals on some but not all asserted claims of asserted patents. Indeed, it has never answered—or to ParkerVision's knowledge been squarely presented with—the legal question posed here. Its only case addressing a subset of asserted claims—*Donnelly* from 30 years ago—does not address these facts or answer the question posed here as described above. If exercising jurisdiction here risked opening floodgates, then surely someone in this Court's 44-year history would have tried a similar appeal before. The district courts' sound exercise of gatekeeping discretion is enough to curb appeals that do not serve Rule 54(b)'s purposes.

### B.    Two other grounds for jurisdiction exist.

Even if Rule 54(b) is not the right doctrinal fit, the Court should still decide ParkerVision's appeal.

**1.** This Court can exercise pendent appellate jurisdiction over the '940 receiver claims because the claim-construction issues for the '907 and '940 receiver claims are "closely interrelated factually." Blue Br. 5–6 (quoting *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1345 (Fed. Cir. 2000)); *accord Micron Tech., Inc. v. Longhorn IP LLC*, 161 F.4th 1374, 1382 (Fed. Cir. 2025). The '907 and '940 receiver claims recite similar down-conversion inventions. And

the district court read identical "generating" limitations into both, thus imposing identical requirements that down-conversion occur at or after the capacitor. Qualcomm's conclusory argument, Red Br. 26, does not defeat this close interrelation.

Nor is pendent jurisdiction over the '940 claims unavailable because the district court did not expressly consider and authorize "a '907-patent-only appeal." Red Br. 26–27. Qualcomm cites no authority suggesting that if this Court identifies a defect in any part of the judgment, then it must dismiss the whole appeal. To the contrary, this Court lacks discretionary review and so must review whatever part of a Rule 54(b) judgment is properly before it. *See Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) ("As an appellate court, we have the responsibility to review the judgments appealed to us."). Qualcomm has made clear that its jurisdictional challenge concerns *only* the '940 patent. ECF No. 14 at 2 n.1. So this Court must consider ParkerVision's appeal on the '907 claims regardless, and should exercise pendent jurisdiction over the '940 issues if needed.

**2.** This Court may also exercise jurisdiction over the '940 claims under 28 U.S.C. § 1292(b). Blue Br. 6. Far from "lack[ing] legal support," Red Br. 27, this procedure comports with longstanding authority for setting aside rigid formality when a ground for jurisdiction exists. A leading treatise recognizes that "if the [district] court erroneously enters judgment under Rule 54(b), the court of appeals may nevertheless decide to review the order if the prerequisites of § 1292(b) have been met." Moore's Federal Practice § 54.27; *see*

8

*Bergstrom v. Sears, Roebuck & Co.*, 599 F.2d 62, 64 (8th Cir. 1979); *Liberty Mut. Ins. v. Wetzel*, 424 U.S. 737, 745 (1976). The reverse also holds: "[A] certification under § 1292(b) may be deemed an entry of judgment under Rule 54(b), so long as the certified order could have been entered as a judgment under the Rule." Moore's Federal Practice § 54.27.

Section 1292(b)'s prerequisites are met here. The district court's Rule 54(b) order shows that certification of the claim-construction order was likely. *See* Blue Br. 6. This Court's exercise of discretion is appropriate here because correcting the erroneous '940 claim construction now best serves judicial economy. And ParkerVision appealed four days after the district court's order, well before the 10-day deadline. Appx509.[2]

## II.   This Court should reverse the district court's claim constructions reading in the *ParkerVision I* "generating" limitation.

The district court's claim constructions cannot stand. Qualcomm disclaims them, giving reason enough to reverse. Anyway, Qualcomm concededly shows no lexicography or disavowal, as would be needed to read in new limitations. And the court's constructions contradict the claim language and the intrinsic and extrinsic records.

---

[2] Insofar as courts can convert Rule 54(b) judgments into § 1292(b) orders, a notice of appeal within 10 days must satisfy § 1292(b)'s deadline. Otherwise, one rigid formality would replace another.

9

**A.  The district court read the *ParkerVision I* "generating" limitation into the claims, thus narrowing the claim scope to circuits that "generate" a down-converted signal "*at or after the capacitor.*"**

The parties framed a straightforward dispute below: Qualcomm sought to read the *ParkerVision I* "generating" limitation into the claims, and ParkerVision opposed. ParkerVision does not "argue that there is not actually a dispute over claim scope requiring resolution." Red Br. 46–47. But Qualcomm mischaracterizes the dispute—and the district court's ruling—by *abandoning* the construction it sought and obtained. Qualcomm thus eviscerates the ground for the noninfringement judgment.

The claim-scope dispute here has always been about the *ParkerVision I* "generating" limitation. As this Court observed in *ParkerVision II*, the claims here do not "expressly," "explicitly," or "on their face" "require the 'generating limitation' that turned out to be fatal to ParkerVision's infringement case in [*ParkerVision I*]." 116 F.4th at 1352, 1359. So this Court unambiguously framed the *sole* claim-construction issue on remand as whether to "read in" the "generating" limitation: "[T]he district court should undertake any necessary claim construction and then determine whether the receiver claims asserted in this case have the same requirement as the generating limitation of the claims at issue in *ParkerVision I*." 116 F.4th at 1360; *see also id.* (framing the issue as whether "the scope of the claims asserted here is materially the same as the scope of those at issue in *ParkerVision I*"); *id.* at 1357 n.4 (noting that

Qualcomm had the burden as the party asking "to read into the receiver claims a limitation that is not expressly recited in the claims").[3]

So what did it mean to "read in" the *ParkerVision I* "generating" limitation? This Court unambiguously answered that question too. It explained that the ParkerVision I "generating" limitation "requires that the accused products produce a low-frequency—*i.e.*, down-converted—baseband signal using energy that has been transferred from a high-frequency carrier signal into a storage medium, such as a capacitor or set of capacitors." *Id.* at 1358 (brackets omitted). "In other words, … the down-converting had to occur at a point in the circuit located *at or after* the capacitor." *Id.* at 1351 (emphasis supplied by this Court) (citing *ParkerVision I*, 621 F. App'x at 1013–14, 1017). This Court could not have been clearer, using this exact "at or after" phrase *six times*— each time with emphasis—to describe the "generating" limitation.[4]

---

[3] ParkerVision does not "argue that [this Court] has already decided the claim construction issues on appeal." Red Br. 48. ParkerVision acknowledged that this Court remanded the claim-construction dispute, *e.g.*, Blue Br. 2, 26, while arguing that this Court's statements about the recited claim scope set the baseline for construing the claims, *e.g.*, *id.* at 34, 45.

[4] *Id.*; *see also id.* at 1353 (recognizing that the *ParkerVision I* claims "required that the down-converting occur *at or after* the capacitor"); *id.* at 1357 (explaining that "the claims in *ParkerVision I*, containing the generating limitation, could only be infringed if the down-conversion occurred at a point *at or after* the capacitor"); *id.* at 1358 (explaining that the *ParkerVision I* "generating" limitation "meant that the down-conversion of the signal had to occur *at or after* the capacitor"); *id.* at 1359 (explaining that none of the claims asserted here "expressly includes the generating limitation or appears to otherwise include a requirement that the down-converted signal be generated from the energy transferred to an energy storage device, such as a capacitor" since "none of the asserted receiver claims in this case appears to require that the down-conversion occur *at or after* the capacitor"); *id.* (discussing ParkerVision's expert testimony that the claims asserted here lack "generating" limitations

The parties thus disputed on remand whether the district court should read in the *ParkerVision I* "generating" limitation. Qualcomm first sought leave to brief this question on remand. Appx19304–05 (asking to brief whether the claims here "communicate[] a 'generating' limitation akin to the one underlying the noninfringement determination in *ParkerVision I*"). After obtaining leave, Qualcomm then asked the district court to read "generating" language into all the claims to represent the *ParkerVision I* "generating" limitation. Appx19016–32. Conversely, ParkerVision opposed reading in the *ParkerVision I* "generating" limitation. Appx18995–9009.

The district court resolved the dispute by adopting Qualcomm's proposed "generating" constructions verbatim, thus reading the *ParkerVision I* "generating" limitation into all the claims. *E.g.*, Appx10 (stating the remanded claim-construction issue as "whether the receiver claims asserted in this case have the same generating limitation of the claims at issue in *ParkerVision I*"); Appx20 (similar); Appx23 (describing Qualcomm's purported "evidence supporting its contention of a generating limitation"); Appx26 (noting "Qualcomm's contention" that the record "supports the inclusion of a generating limitation").

The district court's resolution of this dispute was dispositive. The parties stipulated to noninfringement of the receiver claims, leading to this appeal, *only* because everyone knew that the district court's "generating"

---

because they "do *not* require that the down-conversion occur *at or after* the capacitor").

constructions read in the *ParkerVision I* "generating" limitation and thus required that down-conversion occur at or after the capacitor. Appx19063–64. Without this construction, there would have been no reason to stipulate to noninfringement since, as this Court held in *ParkerVision II*, "the Qualcomm accused products might infringe." 116 F.4th at 1359. Had ParkerVision lost the claim-construction dispute and still refused to stipulate, Qualcomm would have renewed its summary-judgment motion on collateral estoppel. *See id.* at 1360 (recognizing that, after construing the claims, the district court could reassess "whether summary judgment based on collateral estoppel is warranted"); Appx28 (inviting "the parties to resubmit briefing on summary judgment"). The *whole point* of construing the claims on remand was to determine whether collateral estoppel applied based on *ParkerVision I*.

On appeal, ParkerVision urged the same claim-scope position as it urged below: The Court should not read in the *ParkerVision I* "generating" limitation, and so should not require that down-conversion occur at or after the capacitor. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015) (holding that a party preserves its position for appeal when its "argument at trial and the appellate level" has "been sufficiently consistent"); *Barrette Outdoor Living, Inc. v. Fortress Iron, LP*, 156 F.4th 1353, 1362 (Fed. Cir. 2025) (recognizing that a party may rely on new arguments or evidence to support its original claim-scope position). This was no "straw-man attempt to reframe the dispute." Red Br. 55. Rather, ParkerVision framed the dispute

13

exactly as the parties (and courts) always framed it, in the exact words this Court repeatedly used in *ParkerVision II*.

Yet Qualcomm denies—for the first time ever—that this appeal is about whether the claims here have the *ParkerVision I* "generating" limitation, and thus require that down-conversion occur at or after the capacitor. Qualcomm now insists that it "never argued—and the district court never held—that down-conversion must occur 'at or after' the claimed storage device or at any other location." Red Br. 19; *see also id.* at 53 (same); *id.* at 54 (insisting that "the district court did *not* construe the terms to" "requir[e] that the signal be generated 'at or after' the storage device"); *id.* at 55 (denying that the district court's constructions "say anything about the *location* where down-conversion must occur"). Qualcomm thus rewrites the record to avoid defending indefensible constructions.

By arguing that its "generating" constructions do not require down-conversion to occur at or after the capacitor, Qualcomm abandons the ground for noninfringement. This Court should thus vacate the judgment and remand for trial since Qualcomm's products undisputedly "might infringe." *ParkerVision II*, 116 F.4th at 1359. Otherwise, Qualcomm must defend the claim constructions it sought and obtained: narrowing constructions reading the *ParkerVision I* "generating" limitation into all the claims.

14

### B.    Qualcomm concedes that no lexicography or disavowal supports narrowing the claim scope.

Since Qualcomm must defend the district court's constructions that narrow the recited claim scope by reading in the *ParkerVision I* "generating" limitation, Qualcomm must show lexicography or disavowal. But Qualcomm concededly shows neither.

"A patentee 'is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its scope.'" *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (noting the "the stringent standard for narrowing a claim term beyond its plain and ordinary meaning," which requires either lexicography or disavowal). So while the intrinsic record "may shed contextual light on the plain and ordinary meaning," it "cannot be used to narrow a claim term to deviate from the plain and ordinary meaning" without lexicography or disavowal. *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). Yet Qualcomm does not argue that ParkerVision acted as its own lexicographer, or disavowed claim scope, to narrow the asserted claims. That failure alone is dispositive.

Qualcomm observes that even without lexicography or disavowal, the Court may consider the whole patent to determine a term's ordinary meaning. Red Br. 48–49 (citing *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016); *Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016)). Sure. But this case presents

15

no dispute about an ambiguous term's ordinary meaning. Rather, the dispute here is about whether to *narrow* the recited claim scope by *reading in* the *ParkerVision I* "generating" limitation. *See Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 15 n.8 (Fed. Cir. 2020) (distinguishing between "the general role of intrinsic evidence in claim construction" and the evidence needed to "narrow the scope of a claim term"). As this Court explained in *ParkerVision II*, Qualcomm's construction does not construe an ambiguous term but "read[s] into the receiver claims a limitation that is not expressly recited in the claims." 116 F.4th at 1357 & n.4.

Qualcomm cites no case reading in unrecited claim limitations—or otherwise narrowing claim scope—without lexicography or disavowal. In *Eon*, the Court looked to the specification to construe disputed "portable" and "mobile" terms to exclude products only theoretically capable of being moved. 815 F.3d at 1320–22. *Eon* thus involved a routine dispute about ambiguous claim scope. In *Trustees of Columbia*, the Court affirmed a construction of "byte sequence feature" as requiring a representation of "machine code instructions" when the specification *did* contain "statements defining 'byte sequence feature'" this way. 811 F.3d at 1365. The Court rejected the patentee's argument that lexicography requires *expressly* defining a term, holding that a specification need not include formalistic definitional statements to define terms. *Id.* at 1364. But Qualcomm claims no lexicography at all—express, implied, or otherwise. Neither of these cases supports Qualcomm's approach to reading in *unrecited* claim limitations.

Last, Qualcomm is wrong that ParkerVision's alternative to narrowing the recited claim scope is not "construing the claims at all," and thus "cast[ing]" the claim-construction dispute to the jury. Red Br. 29. To repeat, the dispute here is not about the meaning of an ambiguous term. It is about whether to read in an *unrecited* limitation. So the district court might give the jury all the guidance it needs just by giving a plain-meaning instruction (and not mentioning the unrecited "generating" limitation at all). *Cf. Summit 6*, 802 F.3d at 1291 (recognizing that not all claim-construction disputes require the court to expressly construe disputed language for the jury). Or the court might instruct the jury that claims *do not* require that down-conversion occur at or after the capacitor. In any case, *implementing* the proper construction at trial is a separate issue from *resolving* the substantive dispute. So declining to read in the *ParkerVision I* "generating" limitation does not mean submitting a claim-construction dispute to the jury.

## C.    The district court erred by reading the *ParkerVision I* "generating" limitation into the '940 claims.

Both the intrinsic and extrinsic records refute reading the *ParkerVision I* "generating" limitation into the '940 claims.

**1.** The '940 claims' language bars reading in the *ParkerVision I* "generating" limitation. To start, Qualcomm ignores this Court's observations that the '940 claims do not recite the "generating" limitation on their face. *See* Blue Br. 34. That is not up for debate: The district court read in the "generating"

17

limitation not by defining existing language but by adding a whole unrecited phrase: "and using that energy to generate a down-converted signal." Appx28.

Qualcomm hardly addresses the '940 claims' language. The claim explicitly assigns down-conversion to the "UFT module"—undisputedly the switch—by reciting that the switch "alias[es]" (samples) the input electromagnetic single "to down-convert said electromagnetic signal." *See* Blue Br. 34–37. This claim language squares with both the specification and fundamental frequency-translation principles providing that the switch is the only circuit component able to sample and down-convert the input EM signal. *See id.* at 8–13, 38–39.

Qualcomm's sole response: "coleslaw." Red Br. 43–44. Qualcomm rewrites the phrase "to down-convert said electromagnetic signal" as "*in preparation* to down-convert said electromagnetic signal." Qualcomm cites nothing to support this lawyer rewrite. Neither the intrinsic nor extrinsic record supports reading in still other unrecited claim language to support reading in Qualcomm's unrecited "generating" limitation. The specification refutes this reading by repeatedly explaining that the opening and closing of the switch produces the lower-frequency signal; the opening and closing is no mere preparatory step to generating a lower-frequency signal at or after the capacitor. *See* Appx128 (56:39–41) ("The opening and closing of switch **5626** generates a down converted signal **5614**."); *see also* Blue Br. 38–39 (collecting similar disclosures).

18

Recognizing that the switch down-converts the input EM signal does not make the other recited parts "superfluous." Red Br. 44. The recited "signal generator" is needed to generate the "aliasing" signal to drive the switch. Consistent with fundamental frequency-translation principles, this is how the claimed circuit aliases the input signal at the rate of a second, aliasing (local oscillator) signal, producing the desired lower-frequency component. *See* Blue Br. 8–9. The recited "storage device" is needed too, including to filter the down-converted signal and hold transferred samples to discharge into the load when the switch is open, contributing to the continuous down-converted signal. Appx129 (58:9–67). But giving the storage device (capacitor) *a* role does not mean that down-conversion must (or can) occur at or after the storage device.

**2.** Nothing in the specification suggests that the claims require down-conversion to occur at or after the capacitor. The specification says that the UFT module (switch) performs the frequency translation (down-conversion), and repeatedly says that the opening and closing of the switch generates the down-converted signal. Appx127 (54:32–34); Appx128 (55:43–45, 56:39–41); Appx129 (57:41–44, 57:27–30, 58:10–13). Qualcomm ignores these disclosures.

The specification's "Summary Description of Down-conversion Using a [UFT] Module" does not describe down-conversion at or after the capacitor. Red Br. 41–43. The summary describes "alias[ing] the input signal **6404** with the control [aliasing] signal **6406** to generate a down-converted output signal

19

**6412**." Appx129 (58:10–13). Aliasing, as described above, is the process of closing a switch at an aliasing rate (a rate less than twice the frequency of the signal being sampled) to sample the input signal and transfer the sampled energy portions containing the lower-frequency component. Appx354 (20:32–45). The specification explains that the storage device temporarily holds successive samples ("charges") **6422**, which combine in the load to "form" the continuous down-converted signal **6424**:



FIG. 64E

Appx100 (Fig. 64E); Appx129 (58:14–19, 58:53–61). Forming thus connotes *combining* the successive samples **6422** into the continuous signal **6424**. Nothing in the specification suggests that the storage device *down-converts* by temporarily holding transferred samples in a capacitor; the UFT module's aliasing (sampling) the input signal at the aliasing rate already generated the lower-frequency component.

**3.** Because no intrinsic evidence supports reading the *ParkerVision I* "generating" limitation into the '940 claims, extrinsic evidence is irrelevant. *See Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1010 (Fed. Cir. 2023). Anyway, Qualcomm cites only the same inventor (Bultman and Cook) testimony and expert opinions as the district court relied on.

20

*Compare* Red Br. 44–46, *with* Appx25–26. ParkerVision explained why none of this extrinsic evidence supports Qualcomm's construction. Blue Br. 42–44. Qualcomm ignores ParkerVision's explanation. In short, viewed in context, none of Qualcomm's isolated statements about the capacitor's *general role* in the circuit establish that the capacitor down-converts (or can down-convert).

Qualcomm is wrong that "all the technical experts in this case" agree with its construction. Red Br. 45; *see ParkerVision II*, 116 F.4th at 1357 (holding that it was "evident and indisputable that [ParkerVision's expert] repeatedly opined that" the claims here lack a "generating" limitation "because the 'down-converted signal exists at the output of the mixer,' which is a point *before* the capacitor"). Qualcomm's expert, Razavi, has never opined that down-conversion occurs at or after the capacitor, or that this is possible. Qualcomm cites only Razavi's color-coded charts showing the '940 claims next to the *ParkerVision I* claims (though his charts reveal key differences and gaps, including the lack of "generating" language in the claims here), without substantively analyzing any technology. Appx12695–99. Likewise, ParkerVision's expert, Allen (whose reports were adopted by ParkerVision's substitute expert, Steer), unequivocally refuted that the claimed circuits down-convert at or after the capacitor. Appx3418–22; Appx9055–59; Appx9206–07; Appx9255–56. So *no expert* refutes ParkerVision's premise that "capacitor-down-conversion" is not possible and not claimed.

21

#### D. The district court erred by reading the *ParkerVision I* "generating" limitation into the '907 claims.

The intrinsic and extrinsic records also refute reading the *ParkerVision I* "generating" limitation into the '907 claims.

**1.** Qualcomm ignores ParkerVision's analysis of the claim language showing that claim 1's "periodic coupling" steps describe the claimed "method for down-converting." *Compare* Blue Br. 45–49, *with* Red Br. 29–32. Qualcomm repeats its simplistic argument, seemingly adopted by the district court, that the switch does not down-convert because the first limitation to mention the "down-converted signal" is the last limitation: "whereby the energy provided to the load forms a down-converted signal." Red Br. 29–32. Since forming means combining energy portions already containing the down-converted signal, it makes sense that it happens last, after the down-conversion itself. ParkerVision explained why Qualcomm's argument fails, Blue Br. 52–53, and Qualcomm again ignores ParkerVision's explanation.

Qualcomm does not dispute that this last "whereby" clause describes the *result* of the preceding steps. Qualcomm suggests that the claim language still supports its construction because this "whereby" clause describes the result (transferred energy forms a down-converted signal) of the *immediately* preceding step, which recites "providing … energy from the energy storage device to the load" when the switch is open. Red Br. 31–32. This argument ignores that the claim logically groups *all four* preceding steps, which together describe opening and closing (periodically coupling) the switch, transferring energy samples to the storage device and directly to the load when the switch closes,

22

and transferring energy from the storage device to the load when the switch opens. *See* Blue Br. 46–48. Reading the whole claim shows that the "whereby" clause describes the result of using the switch to sample the signal and thus down-convert the sampled energy, not the result of merely providing stored energy to the load. *See Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1333 (Fed. Cir. 2022) (recognizing that "claim construction demands interpretation of the entire claim in context, not a single element in isolation" (quotation marks omitted)).

**2.** The specification's discussion of Figure 83D does not support reading in the *ParkerVision I* "generating" limitation. *Compare* Blue Br. 53 (addressing this disclosure), *with* Red Br. 32–33 (ignoring ParkerVision's brief). Qualcomm quotes statements (1) that a down-converted signal "is formed by energy transferred from the input EM signal"; and (2) that a storage device "outputs the transferred energy as the down-converted signal." Red Br. 32 (quoting Appx379 (69:21–23); Appx394 (100:4–7)). No one disputes that the down-converted signal comprises energy transferred from the input signal, or that the storage device holds some sampled energy before discharging it into the load. But neither statement purports to identify *where* the transferred energy first takes on the lower frequency or which component generates it.[5]

---

[5] For the same reason, ParkerVision did not "agree" with Qualcomm in its *ParkerVision I* brief by recognizing that stored energy "is output as a down-converted signal." Red Br. 34–35. Anyway, what ParkerVision said 12 years ago about the *ParkerVision I* claims is irrelevant to whether the Court should read the *ParkerVision I* "generating" limitation into the different claims here.

**3.** No extrinsic evidence supports reading in the *ParkerVision I* "generating" limitation. First, Qualcomm's expert, Razavi, offered no opinion that the '907 claims recite generating a down-converted signal at or after a capacitor. Again, he only pasted the '907 claims next to the *ParkerVision I* claims without analysis. *See* Appx12678–83.

Second, ParkerVision's expert, Allen, did not admit that the claims recite down-conversion at or after a capacitor by testifying that energy stored in a "storage medium" is "part of" "producing the low frequency baseband signal." *Id.* (quoting Appx7235). Again, Allen refuted that the claimed circuits down-convert at or after the capacitor. *See* Appx3418–22; Appx9055–59; Appx9206–07; Appx9255–56; *ParkerVision II*, 116 F.4th at 1357.

Qualcomm faults Allen's 2019 summary-judgment declaration (but not his 2020 expert report saying the same thing) because Allen relied in part on Figure 126A. Red Br. 38. According to Qualcomm, Figure 126A does not show a down-converted signal at the output of a switch (before the capacitor) because it "shows a *voltage mode* embodiment." *Id.* But Figure 126A illustrates switch-down-conversion just as Allen said. Qualcomm cites no expert testimony (or other evidence) disputing Allen's interpretation of Figure 126A but offers only attorney argument (as with all Qualcomm's points about down-conversion occurring at the capacitor rather than the switch). Current and voltage are just different characteristics of electric charge—think of a water pipe's pressure and flow rate, respectively. The sampled energy reflects a linear relationship between current and voltage—energy equals the product of voltage,

current, and time ($E=VIt$). The circuit works the same no matter whether one measures voltage or current. That Figure 126 uses voltage units (mV) to represent charge does not undermine Allen's use of this figure.

Third, Sorrells (another inventor) did not establish that the '907 claims have the *ParkerVision I* "generating" limitation in his *ParkerVision I* trial testimony about different claims with explicit "generating" limitations. *See* Red Br. 37–38 (citing Appx19050–54).

### E.    ParkerVision asks to construe no new terms.

ParkerVision proposes no new terms for construction. *See* Red Br. 50–53. "Proper claim construction demands interpretation of the entire claim in context, not a single element in isolation." *Sound View*, 33 F.4th at 1333 (quotation marks omitted); *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 792 (Fed. Cir. 2021) (construing a claim term "by examining the surrounding claim language"). Thus, one can understand whether the *ParkerVision I* "generating" limitation should be read into the claims here only by considering what the whole claims recite.

ParkerVision properly relied on surrounding claim language to explain the disputed terms. The '940 claims do not require down-converting a signal at or after the capacitor in part because the claims explicitly assign down-conversion to the recited "universal frequency translation (UFT) module"—a switch—not the separate "storage device." Blue Br. 34–37. Similarly, the '907 claims do not require down-converting at or after the capacitor in part because the recited "periodic coupling" steps—when energy is provided from the

25

input signal to the storage device and directly to the load (switch closed) or from of the storage device to the load (switch open)—perform the frequency translation. *Id.* at 45–49. These arguments do not construe claim terms but place the language that Qualcomm proposed for construction into context.

In any case, Qualcomm identifies no purportedly new claim-scope "dispute" for "UFT module" or "periodic coupling." As the '940 patent unambiguously shows, the UFT module is a switch receiving an input signal and a control signal. *Id.* at 35–36 (citing Appx99 (Fig. 64A); Appx129 (57:41–44)). And the '907 patent is filled with explanation that "periodic coupling" means closing a switch to couple an input EM signal to the other circuit components (storage device and load). *Id.* at 14–16, 49–50; *see, e.g.*, Appx372 (56:16–21); Appx394 (99:57–63, 100:47–56). No one disputes what these terms mean. For instance, Qualcomm does not urge the district court's mischaracterization of the UFT module as a "storage device" rather than a switch, but concedes that it is wrong. Appx24; Red Br. 41 n.5.

## III.  This Court should reassign this case.

First, the district judge would have difficulty setting aside his previous conclusions. Blue Br. 55–57. Qualcomm does not dispute that the judge adhered to past views on remand—including views that the '940 and '907 claims are the same as the *ParkerVision I* claims and that *both* parties' experts support that conclusion. And the judge's derisive comments did not express mere "case management" concerns. Red Br. 57. Qualcomm ignores the judge's criticisms of this Court and its direction to reopen claim construction. *SMOM IV*

26

does not help Qualcomm because the district judge's "missteps" there were "garden-variety errors" and involved no derisive comments about the appellate court or its decisions. 809 F.3d 1171, 1193 (11th Cir. 2015). Here, the judge's adherence to erroneous views—and resistance to this Court's corrective action—show that the judge's views may not be easily and objectively reconsidered.

Second, reassignment is needed to preserve the appearance of justice. Blue Br. 57–60. The judge did not "merely comment[] on the complexity of the technical record." Red Br. 59. He expressed his "opinion" that this case "shouldn't be tried to a jury." Appx18318. That "opinion," coupled with the judge's repeatedly disposing of the case before trial, create the appearance that the judge would avoid ever trying this case, no matter its merit.

ParkerVision accurately described the judge's callous refusal to allow expert substitution despite ParkerVision's expert's retirement and serious diagnosis. Qualcomm accuses ParkerVision of "profoundly mischaracteriz[ing] the record" because ParkerVision first sought substitution based on its expert's retirement, then sought reconsideration based on his diagnosis. Red Br. 59–60. But ParkerVision misrepresented nothing. ParkerVision did not know why its expert retired when it first sought substitution (and it stands to reason that the expert would have preferred the courtesy of being allowed to withdraw based on retirement alone, without publicly litigating his health issues). ParkerVision promptly told the court of the diagnosis when it received that information—and *did* provide evidence that the expert could unlikely testify. *See*

27

Appx193112–16; Appx19317–321 (documenting the diagnosis and its likely impact). Yet the judge still denied substitution.[6]

The judge's order denying Qualcomm a TRO against ParkerVision's purported "media blitz" does not undermine ParkerVision but further favors reassignment. Red Br. 61. *Without allowing ParkerVision to respond*, Appx19280, the judge found "ParkerVision's media campaign distasteful," simply crediting Qualcomm's accusation "that ParkerVision's media campaign appears littered with spin, half-truths, and outright lies," Appx19283–84. A judge who reflexively defers to one side, publicly labels the other a liar, proclaims that the case should never see a jury, limits key proof, and openly criticizes this Court does not preserve the appearance of fairness.

Third, reassigning this case would lead to no disproportional waste. Blue Br. 60. Qualcomm distinguishes *Gupta*—which reassigned a case with a "protracted history" after multiple appeals—by arguing that this Court's prior decisions here are only "helpful on discrete legal issues." Red Br. 62. That is wrong. *ParkerVision II* alone details the technology and this case's "litigation saga." 116 F.4th at 1349–54. Anyway, preserving justice (and its appearance) outweighs any waste here.

---

[6] ParkerVision did not "mention" the severity if its expert's diagnosis "for the first time in this appeal," as Qualcomm falsely states. Red Br. 60 n.11. ParkerVision fully disclosed the diagnosis in the record pages cited above.

## CONCLUSION

This Court should reverse the judgment and reassign this case.

March 23, 2026

Kevin Burgess
MCKOOL SMITH, P.C.
104 East Houston Street, Suite 300
Marshall, Texas 75670

Colin Hickl
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1200
Dallas, Texas 75201

Respectfully submitted,

*/s/ Charles E. Fowler, Jr.*
Charles E. Fowler, Jr.
Joshua W. Budwin
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, Texas 78701
(512) 692-8722
cfowler@mckoolsmith.com

Counsel for Plaintiff-Appellant ParkerVision, Inc.

29

**CERTIFICATE OF COMPLIANCE**

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because it contains 7,000 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Equity OT A 14-point font.

*/s/ Charles E. Fowler, Jr.*
Charles E. Fowler, Jr.

**CERTIFICATE OF SERVICE**

On February 4, 2026, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which served it on all counsel of record.

*/s/ Charles E. Fowler, Jr.*
Charles E. Fowler, Jr.